Elma TATUM, as administrator of the Estate of Dixie V. Tatum, deceased, Plaintiff-Appellant,

v.

SCHERING CORPORATION, Defendant-Appellee.

No. 85–7483.

United States Court of Appeals, Eleventh Circuit.

Aug. 4, 1986.

As Corrected Aug. 15, 1986.

---

Frank M. Wilson, Beasley and Wilson, Montgomery, Ala., for plaintiff-appellant.

Jean-Pierre Garnier, Falls Church, Va., for defendant-appellee.

Before GODBOLD, Chief Judge, VANCE, Circuit Judge, and THOMAS [*], Senior District Judge.

## CORRECTED OPINION

GODBOLD, Chief Judge:

This is a wrongful death suit, removed from Alabama state court, against Schering Corporation, a manufacturer of drugs. The district court granted summary judgment to Schering. We reverse.

The suit was brought under the Alabama Extended Manufacturer's Liability Doctrine [1] and negligence. Because ethical drugs are considered unavoidably unsafe products, they are defective only when not accompanied by an adequate warning. *Stone v. Smith, Kline & French Laboratories*, 447 So.2d 1301, 1304 (Ala.1984).

Plaintiff's theory is that Schering failed to give adequate warning to the treating physician who, without adequate knowledge of the danger involved in administering Schering's drug Solganol, allegedly administered it improperly, causing decedent's death.

The case was originally brought against Schering, Dr. Charles Karst (the treating physician) and Merck, Sharpe and Dohme (another drug manufacturer). In state court, before removal, Dr. Karst and Merck entered into pro tanto settlements with plaintiff, and the case was then removed to federal court.

The district court granted summary judgment for Schering on a record containing several depositions from experts for both sides, and depositions from Dr. Karst, one given before he settled with plaintiff and another after he settled. The summary judgment record reveals the following. Plaintiff's decedent, Mrs. Dixie V. Tatum, was diagnosed as having rheumatoid arthritis by Dr. Karst and received gold therapy treatments from December 1981 through August 1982. Gold therapy is recognized as an appropriate and effective method of treatment for rheumatoid arthritis despite its attendant risks. Two gold salts drugs were administered interchangeably on Mrs. Tatum by injection during the course of her therapy, Myochrysine, manufactured by Merck, and Solganol, manufactured by Schering.

It is undisputed that during the administration of gold therapy a patient's white blood count should be monitored. A white blood count below 4,000 indicates the possible presence of leukopenia, a potential forerunner of aplastic anemia, in which case gold therapy should be stopped at once. Both Schering and Merck had such instructions accompanying their products in package information sheets.

During the course of Mrs. Tatum's gold therapy Dr. Karst did not personally check her to determine her white blood count (or for any other purpose). The gold salts injections were administered by Dr. Karst's nurse. On July 19, 1982, although Mrs. Tatum's white blood count dropped to 3,808, she was given another injection of the gold salts. On August 2, 1982 her white blood count had dropped to 2,882, but

---

[*] Honorable Daniel H. Thomas, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. *Casrell v. Altec Industries, Inc.*, 335 So.2d 128 (Ala.1976); *Atkins v. American Motors Corporation*, 335 S.2d 134 (Ala.1976). This doctrine is a modified form of the strict liability provided by the Restatement (Second) of Torts, § 402–A. Alabama has applied § 402–A to ethical drugs. *Stone v. Smith, Kline and French Laboratories*, 447 So.2d 1301 (Ala.1984).

she was given another injection of gold salts. By August 31, 1982, her white count had dropped to 1,717. In October 1982, Mrs. Tatum died as a result of what was diagnosed as aplastic anemia.

The district court discussed the purpose of acquiring a manufacturer's warning, the relation between the warning and the physician's independent knowledge, and the proximate cause equation.

> It is clear therefore that since the manufacturer's goal in warning is to provide the physician with knowledge, when that physician has such knowledge, either from the manufacturer or independently, there can be no causal link between a failure to advise a physician of what he already well knows and the death of a patient treated by that physician.

> \*   \*   \*   \*   \*   \*

> It all returns therefore to the critical inquiry of what Dr. Karst knew, for on the question of causation it matters not where the knowledge came from.

The district court did not address the issue of whether warnings given by Schering were adequate. Rather it held that even if the warnings were inadequate, under the undisputed material facts Dr. Karst's own knowledge acquired independently of warnings by Schering was such that Schering's failure to warn him was not a sole or contributing proximate cause of decedent's death.[2] The court held that the evidence was uncontroverted that "Dr. Karst knew all that plaintiff contends he should have known" about Solganol. The court erred in concluding that there was no disputed issue of material fact concerning whether Dr. Karst had independent knowledge of the subject matter of warnings that plaintiff contends should have been given (and assumed by the court to be inadequate).

### I.  Extent or level of risk

Plaintiff identifies several areas in which he contends that Schering should have warned and that were not embraced in Dr. Karst's independent knowledge. The first concerns what might be loosely described as extent or level of risk. Plaintiff says that Schering's warning, in the Solganol box insert, was inadequate because it failed to state that a certain percentage of people to whom Solganol is administered will contract aplastic anemia regardless of the monitoring of such a person. The court disposed of this contention on the ground that, according to Dr. Karst's testimony, before he began the gold therapy treatment he explained to Mrs. Tatum that the drug he would administer could kill her even though he would be monitoring her, and this statement demonstrated knowledge by Dr. Karst of what an adequate warning on the subject would have conveyed, thus the assumed inadequacy was irrelevant. But the court's approach did not address extent or level of the risk of death or other serious adverse reaction. Dr. Karst's statement to Mrs. Tatum established, for summary judgment purposes, that he knew there was some risk of death. But he testified that he did not know the percentage of patients treated with gold who developed leukopenia or aplastic anemia, that he was not aware of the incidence of fatality from the use of Solganol, nor was he aware that gold has a higher incidence of death than other drugs. This testimony is inconsistent with the district court's holding that Dr. Karst knew everything that plaintiff says he should have been warned about. The knowledge that Dr. Karst did have—that Solganol could kill—does not preclude a factfinder's concluding that had Dr. Karst known the actual degree or extent of risk of death or other serious adverse effect, he would not have prescribed the drug for Mrs. Tatum in particular, or for other patients in general having the same state of severity of diagnosis or prognosis as Mrs. Tatum. Nor does it preclude a factfinder's concluding that had Dr. Karst informed Mrs. Tatum of the information plaintiff says should have

---

**2.** A considerable amount of Schering's effort on appeal is directed to asking this court to hold that the warnings assumed by the district court to be inadequate are in fact adequate. This we decline to do.

been conveyed to him, Mrs. Tatum would not have agreed to the treatment.

Plaintiff makes a second point concerning failure to sufficiently warn of risks. Plaintiff's expert testified that Schering's use in the box insert of the word "rare" to describe the incidence of hematologic adverse reactions was weak, did not accurately describe the incidence, and failed to say that the drug should be discontinued at the first sign of adverse reaction. The district court disposed of these contentions, too, on the basis of irrelevance; *i.e.*, because Dr. Karst knew the drug was high risk and reactions might be irreversible and held some potential for death regardless of monitoring, the absence of the above information could not be a proximate cause. This is error for the same reasons set out above.

## II. *Establishing a baseline for blood comparison*

One of plaintiff's experts described Schering's warning as inadequate in failing to instruct the prescribing physician to establish a baseline of blood values for comparison. We can find no testimony by Dr. Karst indicating that he did—or did not— know that this should be done. His testimony indicates that he may have done some blood work before administering the gold salts but for what purpose is unclear. The district court did not address this point.

## III. *The method of giving new warning of higher risk*

Plaintiff also questions the method by which Schering instituted its package insert warning. He asserts that in 1979 the Food and Drug Administration prescribed a "boxed warning" for adverse reactions that could be fatal. Schering revised its package insert accordingly but took no action other than to include the new package insert in the product and publish it in the Physicians' Desk Reference. No letters were written to physicians and no bulletins sent to Schering detailmen, nor were detailmen told to bring the matter to the attention of physicians. There is evidence that Schering's method of calling attention to a change in warning indicating a higher risk

of serious adverse reaction than previously described is inconsistent with the practice of other drug manufacturers. This issue was not considered by the district court

## IV. *Warning of treatment for adverse reaction*

We agree with the district court that in one respect, under the material undisputed facts, Dr. Karst's independent knowledge barred a conclusion of proximate cause. Plaintiff asserted that Schering's package information sheet recommended treatments for toxicity arising from use of the drug even though the treatments were not of proven value. He contends that the warnings should have stated that treatments recommended for adverse reaction have not been proved to be of value or are controversial. The district court, assuming that what was in the information sheet was misleading, found no proximate cause because of the doctor's independent knowledge. What Dr. Karst testified to concerning his knowledge was that there is no known, universally accepted treatment for aplastic anemia, and that nothing in the information sheet or in any other source could cause him to change his belief. In this respect the doctor's independent knowledge was substantially the same as the knowledge that plaintiff contends should have been communicated to him by Schering.

## V. *Credibility*

The summary judgment record raises an additional question of credibility. The district court accepted as true Dr. Karst's deposition testimony describing the state and extent of his knowledge. But his testimony is not necessarily consistent. In his first deposition he said: "I am not aware of any increased risk of death as related to gold than any other drugs." In his second deposition, he admitted that gold would carry the highest risk of death of any of the drugs that he prescribes and said that his former statement was incorrect. He testified that he warned Mrs. Tatum that the medication could kill her. Elsewhere he stated that he had not read in medical

literature that death could result from the use of gold.

Under the undisputed material facts a factfinder could infer lack of knowledge by Dr. Karst from the fact that he allowed his nurses to administer the drug without his personally checking the patient on each occasion that gold therapy was given, and that his staff continued the injections in the presence of signs of toxicity and even though blood counts indicated that it should be discontinued. A factfinder could infer lack of knowledge on the part of Dr. Karst by his asking Merck's detailmen whether other deaths had been reported from aplastic anemia and how soon in the course of rheumatoid arthritis gold should be used. In short, a jury could infer from this evidence that Dr. Karst did not possess the knowledge that he described himself as having.[3]

The summary judgment must be reversed. We do not imply that the district judge's arguendo assumptions that warnings, or lack thereof, were inadequate were correct or incorrect, or whether on remand this issue can be decided on summary judgment or must be decided at trial. Nor do we hold or imply that proximate cause in fact exists with respect to one or more inadequacies, if any, found on remand to exist. All that we hold is that on the summary judgment record before us there are material disputed issues of fact that made it incorrect to hold by summary judgment that proximate cause did not exist.

REVERSED.

THOMAS, Senior District Judge, dissenting:

With deference to the opinion of the majority, I must respectfully dissent.

It seems to me that the majority opinion leaves more issues unanswered than answered; the main one is whether Schering's warning was or was not sufficient. To me, the warning was clearly sufficient. *Stone v. Smith, Kline and French Labor-*atories, 447 So.2d 1301 (Ala.1984). I think it is the duty of the courts to meet the issues and not leave them unanswered. This issue was briefed by both litigants and is squarely before us.

The majority opinion goes to lengths to point out what the doctor did *not* know. More importantly, is what the doctor *did* know. He certainly knew that the dosage should be discontinued when the patient's white blood count falls below 4,000. If he did not, it was certainly not Schering's fault, for as the majority opinion states: "A white blood count below 4,000 indicates the possible presence of leukopenia, a potential forerunner of aplastic anemia, in which case gold therapy should be stopped at once. Both Schering and Merck had such instructions accompanying their products in package information sheets."

Mrs. Tatum's death was diagnosed as aplastic anemia. As for the product Solganol and its use, Schering certainly had provided the doctor with all the knowledge he needed *in the posture of this case.* And as stated above, the warnings given by Schering more than met the standard contemplated by *Stone v. Smith, Kline and French Laboratories, supra.*

This case should have ended when the $450,000 negotiated settlement was reached between Merck, the doctor and the plaintiff. To prolong the same through legal manuevers is not justified.

I would affirm Judge Hobb's granting of the summary judgment, but if, as the majority holds, the case was not ripe for summary judgment on the theory that the doctor "knew it all", then certainly it is ripe for such judgment on the "adequacy of warning" theory. *Helena Rubinstein, Inc. v. Bau,* 433 F.2d 1021, 1023 (9th Cir.1970); *Sellers v. Regents of Univ. of California,* 432 F.2d 493, 496 (9th Cir.1970), *cert. den.* 401 U.S. 981, 91 S.Ct. 1194, 28 L.Ed.2d 333 (1971). Hence, the harmless error theory prevails.

---

**3.** Of course, the jury could infer that he possessed the knowledge but acted despite it. But it was not required to draw this inference.