**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 17 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

MARK W. ECK, SANDRA K. ECK,
TRAVIS ECK and MEGAN ECK,

Plaintiffs-Appellants,

v.

No. 00-7020

PARKE, DAVIS & COMPANY,
WARNER-LAMBERT COMPANY,
THE RUGBY GROUP, INC., AND
RUGBY LABORATORIES, INC.,

Defendants-Appellees.

**Appeal from the United States District Court**
**for the E.D. Oklahoma**
**(D.C. NO. 99-CV-156-S)**

Steven E. Aldous, Slack & Davis, L.L.P., Austin, Texas, for Appellants.

Brad Smith (Mike Barkley with him on the brief) of Barkley Titus Hillis &
Reynolds, Tulsa, Oklahoma, for Appellees Parke, Davis & Company and Warner-
Lambert Company.

Thomas E. Steichen (Richard M. Eldridge with him on the brief) of Rhodes,
Hieronymus, Jones, Tucker & Gable, P.L.L.C., Tulsa, Oklahoma, for Appellees
The Rugby Group, Inc. and Rugby Laboratories, Inc.

Before **HENRY** and **MURPHY**, Circuit Judges, and **VAN BEBBER**, District Judge. [*]

---

**HENRY,** Circuit Judge.

---

Mark W. Eck, suffering from injuries sustained from an onset of liver failure, brought, together with members of his family, this products liability action [1] against defendants Parke, Davis & Company and Warner-Lambert Company (jointly, "Warner-Lambert") and the Rugby Group, Inc. and Rugby Laboratories, Inc. (jointly, "Rugby"). [2] The Ecks contended that Mr. Eck's liver failure resulted from the interaction of two prescription drugs: (1) Dilantin, an anti-convulsant, which is manufactured and distributed by Warner-Lambert, and (2) Isocet (which contains acetaminophen, butalbital and caffeine), and which is distributed by Rugby. The defendants filed a motion for summary judgment in the district court, which the district court granted. The district court found that the

---

[*] The Honorable G. Thomas Van Bebber, United States Senior District Judge for the District of Kansas, sitting by designation.

[1] Sandra Eck, the wife of Mark Eck, brought a claim for loss of spousal consortium. Two of Mark Eck's children, Travis and Megan Eck, brought claims for loss of parental consortium.

[2] Plaintiffs also sued Hoechst Marion Roussel, Inc. and Watson Pharmaceuticals, Inc., who were dismissed from this action by the district court.

Ecks' claims were barred by the learned intermediary doctrine. For the reasons set forth below, we affirm the district court's decision. We are called upon to decide only the liability of these defendants; the liability of other actors is not before us.

## I. BACKGROUND

The following facts are undisputed. Mr. Eck is a pharmacist who owns and operates Eck Pharmacy in Healdton, Oklahoma. In 1992 or 1993, Dr. Mark Newey became Mr. Eck's treating physician. On March 13, 1994 and on January 19, 1995, Dr. Newey prescribed Isocet to Mr. Eck to treat his complaints of tension headaches. At the time the Isocet was prescribed by Dr. Newey, Mr. Eck was not taking Dilantin.

Mr. Eck has a history of mild temporal lobe seizures. In October 1996, Dr. Newey prescribed Tegretol, another anti-convulsant medication, after Mr. Eck began to experience seizures. While on the Tegretol, Mr. Eck developed a rash and Dr. Newey referred him in mid-December 1996 to Dr. Dan Udonta, who, in turn, prescribed Depakote in lieu of the Tegretol. Mr. Eck again developed a rash. On January 31, 1997, Dr. Udonta referred Mr. Eck to Dr. Nancy Rodgers, an epilepsy specialist.

Five days later Mr. Eck experienced another seizure-related episode. Dr. Newey came to Mr. Eck's house and consulted with Dr. Rodgers via telephone. Mr. Eck was admitted to the Healdton Hospital emergency room on February 5, 1997. Dr. Newey ordered a 900 mg loading dose of Dilantin that was given to Mr. Eck. He was discharged on February 6, 1997, and sent by Dr. Newey to see Dr. Rodgers. Thereafter, Dr. Rodgers removed Mr. Eck from the Depakote and prescribed Dilantin to control his seizures. Dr. Newey monitored his Dilantin levels during the time Dr. Rodgers prescribed Dilantin.

On April 5, 1997, Mr. Eck began to feel anxious. On April 7, 1997, he began experiencing a tension headache and took two Isocet tablets (each containing 325 mg of acetaminophen) from his January 19, 1995 prescription. During this period of time, Mr. Eck was also taking Dilantin, prescribed in February by Dr. Rodgers to control his seizures. He had taken 400 mg of Dilantin that day.

On April 8, 1997, Mr. Eck began vomiting repeatedly and his condition continued to deteriorate. Dr. Newey admitted him to Mercy Hospital in Ardmore, Oklahoma. At Mercy Hospital, Mr. Eck was diagnosed with acute liver failure and he was transported to Baylor Medical Center in Dallas, Texas. A liver biopsy revealed that Mr. Eck's liver failure was consistent with acetaminophen poisoning. As a result of his liver failure and related complications, Mr. Eck was

in a coma and on a ventilator for 36 days. He underwent various surgeries and had an extended hospital stay.

In granting the defendants' motion for summary judgment, the district court found that Oklahoma's "learned intermediary doctrine" shielded Warner-Lambert and Rugby from liability because any failure to warn was not the proximate cause of Mr. Eck's injuries. The district court found summary judgment inappropriate with respect to the two related grounds of (1) no duty to warn when there is no known danger of the interaction of the drugs at therapeutic levels, and (2) the absence of medical causation. Because we affirm for the reasons given below, we need not address the appropriateness of the denial of summary judgment on these grounds.

On appeal, the Ecks challenge: (1) the district court's decision to limit its focus of inquiry to the testimony of Dr. Rodgers, the physician who prescribed Dilantin, and not to consider the testimony of Dr. Newey, the prescribing physician for Isocet; (2) the district court's conclusion that Dr. Rodgers' testimony rebutted the presumption that had an adequate warning been provided, it would have been read and heeded; and (3) the district court's finding that no issues of material fact regarding causation existed. After we review the progression and rationale of the learned intermediary doctrine, we shall discuss each contention in turn.

## II. INITIAL MATTERS

### A. Standard of Review

This diversity action is governed by Oklahoma's substantive tort law, but we are governed by federal law in determining the propriety of the district court's grant of summary judgment. See Pegasus Helicopters, Inc. v. United Techs. Corp., 35 F.3d 507, 510 (10th Cir. 1994). "We review the entry of summary judgment de novo, drawing all reasonable inferences in favor of the nonmovants. Summary judgment is appropriate only when the moving party shows there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. To avoid summary judgment, the nonmovant must make a showing sufficient to establish an inference of the existence of each element essential to the case. The nonmovant may not rest upon mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." Hulsey v. Kmart, Inc., 43 F.3d 555, 557 (10th Cir. 1994) (quotations and citations omitted).

### B. Failure to Warn and the Learned Intermediary Doctrine

The Ecks contend that Warner-Lambert and Rugby, by failing to label their products with adequate warnings of Dilantin's propensity to interact with

acetaminophen, placed defective and unreasonably dangerous products in the market place that caused Mr. Eck's liver failure. The Ecks also contend the defendants were negligent in the designing, testing, warning, and marketing of their products through their failure to provide adequate instructions or warnings and by misrepresenting the safety of their products when used in conjunction with one another.

To recover in a failure to warn case, a plaintiff must establish both cause-in-fact (that the product in question caused the injury) and proximate cause (that the manufacturer of the product "breached a duty to warn of possible detrimental reactions"). McKee v. Moore, 648 P.2d 21, 23-24 (Okla. 1982). To qualify as a proximate cause of the injury, the breach of a duty or failure to warn must be a substantial contributing factor in bringing about the harm in question. See Woolard v. JLG Indus. Inc., 210 F.3d 1158, 1172 (10th Cir. 2000) (applying Oklahoma law) (noting that "a proximate cause is defined as one that, in the natural and continuous sequence, produces the plaintiff's injury and without which the injury would not have happened"); Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481, 492 (3d Cir. 1985) (applying Pennsylvania law) (internal quotation marks omitted).

Oklahoma's products liability law "generally requires a manufacturer to warn consumers of danger associated with the use of its product to the extent the

manufacturer knew or should have known of the danger." Edwards v. Basel Pharms., 933 P.2d 298, 300 (Okla. 1997). Certain products, including prescription drugs, are "unavoidably unsafe products" that cannot be made completely safe, but serve a public benefit. See id.; Restatement (Second) Torts § 402A cmt. k (1965) (the "Restatement"). Oklahoma law recognizes that drug manufacturers cannot be strictly liable merely because of the dangerous propensities of such products. See Edwards, 933 P.2d at 300. Such products, if "properly prepared, and accompanied by proper directions and warning[s, are] not defective, nor [are they] unreasonably dangerous." Restatement § 402A cmt. k; Edwards, 933 P.2d at 300 (stating that "the law regarding such products appears at Comment k of the Restatement").

Relying on Comment k, the Edwards court noted the exception to the manufacturer's duty to warn the ultimate consumer known as the "learned intermediary doctrine": where a product is properly prepared and marketed and proper warning is given to the prescribing physicians, the manufacturer is shielded from liability. Edwards, 933 P.2d at 300. "The reasoning behind this rule is that the doctor acts as a learned intermediary between the patient and the prescription drug manufacturer by assessing the medical risks in light of the patient's needs." Id.

The Edwards court adopted the rationale cited by the Kansas Supreme Court

when it adopted the learned intermediary doctrine:

> Where a product is available only on prescription or through the services of a physician, the physician acts as a 'learned intermediary' between the manufacturer or seller and the patient. It is his duty to inform himself of the qualities and characteristics of those products which he prescribes for or administers to or uses on his patients, *and to exercise independent judgment, taking into account his knowledge of the patient as well as the product.* The patient is expected to and, it can be presumed, does place primary reliance upon that judgment. The physician decides what facts should be told to the patient. Thus, if the product is properly labeled and carries the necessary instructions and warnings to fully apprize the physician of the proper procedures for use and the dangers involved, *the manufacturer may reasonably assume that the physician will exercise the informed judgment thereby gained* in conjunction with his own independent learning, in the best interest of the patient.

Edwards, 833 P.2d at 300-01 (emphasis added) (quoting Wooderson v. Ortho Pharm. Corp., 681 P.2d 1038, 1052 (1984) (applying Kansas law)). This rationale applies to prescription drugs, because "the patient may obtain the drug only through a physician's prescription, and the use of prescription drugs is generally monitored by a physician." Id. at 301; see also Garside v. Osco Drug, Inc., 976 F.2d 77, 80 (1st Cir. 1992) (applying Massachusetts law) ("The rationale underlying the [learned intermediary doctrine] is that the prescribing physician, as the 'learned intermediary' standing between the manufacturer and consumer/patient, is generally in the best position to evaluate the potential risks and benefits of ingesting a certain drug and to advise the patient accordingly.

Under this doctrine, the manufacturer's duty is fulfilled once it adequately warns the physician.").

Thus, in this case, the Ecks contend that Warner-Lambert had a duty to adequately warn Dr. Rodgers, the prescribing physician, and Rugby had a duty to adequately warn Dr. Newey, the treating physician, of the qualities and characteristics of Dilantin and acetaminophen and of potential risks associated with their concomitant use.

## C. The Rebuttable Presumption under the Learned Intermediary Doctrine

Under Oklahoma law, the Ecks benefit from the development of a rebuttable presumption in their favor:

> [w]here a consumer, whose injury the manufacturer should have reasonably foreseen, is injured by a product sold without a required warning, a *rebuttable presumption* will arise that the consumer would have read any warning provided by the manufacturer, and acted so as to minimize the risks.

Cunningham v. Charles Pfizer & Co., 532 P.2d 1377, 1382 (Okla. 1974) (emphasis added) (quoting Reyes v. Wyeth Labs., 498 F.2d 1264, 1281 (5th Cir. 1974) (applying Texas law)). The manufacturer warns the consumer, who is the prescribing physician, who, in turn, acts as the learned intermediary. See Woulfe v. Eli Lilly & Co., 965 F. Supp. 1478, 1483 (E.D. Okla. 1997) (stating the

-10-

Cunningham rebuttable "presumption . . . applies equally to the situation of learned intermediaries").

"In the duty to warn context, assuming that plaintiffs have established both duty and a failure to warn, plaintiffs must further establish proximate causation by showing that had defendant issued a proper warning to the learned intermediary, he would have altered his behavior and the injury would have been avoided." Mazur v. Merck & Co., 742 F. Supp. 239, 262 (E.D. Pa. 1990); see Thomas v. Hoffman-LaRoche, Inc., 949 F.2d 806, 812 (5th Cir. 1992) (applying Mississippi law) (stating that "to create a jury question, the evidence introduced must be of sufficient weight to establish, by the preponderance of the evidence, at least some reasonable likelihood that an adequate warning would have prevented the plaintiff from receiving the drug"). To inform the prescribing physicians of the potential risks of an interaction during the concomitant use of acetaminophen and Dilantin, Mr. Eck proposed that the following warning should have been included on both products:

> Phenytoin (generic name for Dilantin) may enhance the hepatoxicity of acetaminophen secondary to enzyme induction and glutathione depletion. Patients are advised to avoid concomitant use of acetaminophen and phenytoin.

Aplt's App. vol. III, doc. 31, at 2 (Dist. Ct. Order filed Jan. 18, 2000).

The district court apparently assumed without deciding that the Ecks demonstrated that the manufacturer failed to warn of a non-obvious risk about

-11-

which it knew or should have known, pursuant to Cunningham. Because the adequacy of the proposed warning is irrelevant in light of Dr. Rogers' testimony discussed *infra*, we assume, for the limited purposes of this appeal, that the Ecks are correct in their assertion that the defendants failed to warn the prescribing physician of this risk. The Ecks thus receive the benefit of a rebuttable presumption that an adequate warning "would have been read and heeded." Woulfe, 965 F. Supp. at 1483; cf. Van Buskirk, 760 F.2d at 493 (noting that defendant may "defeat causation in a failure to warn case by discrediting plaintiffs' claims that . . . [the learned intermediary] . . . would have acted to avoid" the injury).

Having established the presumption of causation-in-fact in the Ecks' favor, we must next determine whether the defendants, through the testimony of Drs. Rodgers and Newey, have rebutted this presumption. The defendants may rebut this presumption by establishing that although the prescribing physician would have "read and heeded" the warning or additional information, this would not have changed the prescribing physician's course of treatment. See Woulfe, 965 F. Supp. at 1485. The weight we afford to the physicians' "testimony . . . depends on the substance of the evidence as well as the credibility and reliability of the treating physician[s]." Id.

-12-

Assuming the defendants successfully rebut this presumption, the burden shifts rather heavily back upon the Ecks. Our inquiry looks to whether the Ecks "[came] forward with evidence sufficient to submit the case to a jury to determine if [defendants'] alleged inadequate warning[s]" were a proximate cause of Mr. Eck's injuries. Id. at 1483; see also Garside, 976 F.2d at 81 (noting that "once the presumption is rebutted, plaintiff must produce sufficient evidence to create a triable issue on the question of causation"). To submit the case to a jury, the Ecks must either discredit the physicians' testimony or call into question the substance of the testimony, or otherwise demonstrate that the alleged failure to warn was the proximate cause of their injuries. Such a showing requires that the plaintiff "demonstrate that the additional non-disclosed risk was sufficiently high that it would have changed the treating physician's decision to prescribe the product for the plaintiff." Thomas, 949 F.2d at 813 (applying Mississippi law); see also Woulfe, 965 F. Supp. at 1485-86; In re Norplant Contraceptive Prods. Liability Litig., 955 F. Supp. 700, 710 (E.D. Tex. 1997) (where physician was aware of dangers associated with drug and information that would have been provided in warning would not have changed his decision to prescribe drug, court held no causation), aff'd, 165 F.3d 374 (5th Cir. 1999).

## III. DISCUSSION

The Ecks contend that the district court made several errors when it granted summary judgment to the defendants. First, they challenge the court's decision to focus primarily on the testimony given by Dr. Rodgers rather than also looking at the testimony given by Dr. Newey. Second, they dispute that Dr. Rodgers' testimony rebuts the presumption that she would have read and heeded a warning about the interaction of Dilantin and acetaminophen. They also suggest that because her testimony did not unequivocally indicate she had substantially the same knowledge of the adverse risks that their proposed warnings would have imparted, she could not properly evaluate the risks of the drugs' interaction. Finally, they point to disputed testimony as evidence that material issues of fact regarding causation survived.

**A. Dr. Newey**

The Ecks first challenge the district court's decision to limit its inquiry to whether Dr. Rodgers would have prescribed Dilantin to Mr. Eck even if a warning had been provided. The Ecks argue that the prescribing practices of Dr. Newey, Mr. Eck's treating physician, are also relevant, because the interaction of the Isocet, prescribed by Dr. Newey, and the Dilantin, initially prescribed and later monitored by him, were the cause of Mr. Eck's injuries. Thus, the defendants

must also establish that his practices would not have been altered with the inclusion of a warning.

The Ecks emphasize that Dr. Newey testified that had he known of the interaction between the two drugs, he would have passed this information on to his patients. We acknowledge that Dr. Newey was the prescribing physician for Isocet in January 1995, and also prescribed the loading dose of Dilantin to Mr. Eck in February 1997, and continued to monitor his patient after Dr. Rodgers resumed the prescribing physician role. However, it is undisputed that Mr. Eck did not ingest the Isocet concomitantly with Dilantin until April 1997, when his prescribing physician was Dr. Rodgers. There was no concomitant use of the drugs when Isocet was originally prescribed, and there is no indication that in 1995 Mr. Eck was suffering from seizures that might require a Dilantin prescription. That Dr. Newey might have heeded a warning to Mr. Eck about possible adverse effects were he to prescribe Isocet to him in 1997 is of no significance given the facts before us. We hold the district court did not err when it focused exclusively on the testimony of Dr. Rodgers as the prescribing physician.

**B. Did Dr. Rodgers' Testimony Rebut the Presumption?**

The Ecks next challenge whether the defendants presented evidence to rebut the presumption that had Dr. Rodgers been properly warned, she would have read and heeded the warning. The Ecks also question whether Dr. Rodgers' knowledge about the adverse risks was substantially the same as the risks presented in the proposed warning. If not, they posit, she would be unable to incorporate the adverse risks into her risk/benefit analysis.

In rebutting the presumption, the defendants offer Dr. Rodgers' deposition testimony. Dr. Rodgers testified that she discussed with Mr. Eck the list of medications he was taking, but does not recall that Isocet was on the list. She stated that the Ecks assured her Mr. Eck was not taking any medications other than those on the list. See Aplt's App. vol. II, at 573 (depo. of Dr. Rodgers).

Dr. Rodgers also indicated that she had discussed Mr. Eck's acetaminophen intake with him. She told him that his intake of up to twelve tablets a day of Tylenol was "way too much," id. at 574, and indicated that she feared this intake because "[acetaminophen] was hepatotoxic." Id. She testified that Mr. Eck indicated that he understood what "hepatotoxic" meant. Id.

Dr. Rodgers also testified that she was aware of medical literature that suggested Dilantin might be a "enzyme inducer" that could increase the hepatotoxicity of acetaminophen. She also testified that she was aware of the

-16-

possibility of an adverse reaction when Dilantin and acetaminophen were taken together.  See id. at 574, 740.

Dr. Rodgers further testified that she performs a "risk/benefit analysis for every medication."  Id. at 740.  In weighing the risks and benefits, she concluded that she would have prescribed Dilantin "even if [Mr. Eck] had been on a drug that had a more frequent hepatotoxicity [than acetaminophen] . . . because the risk of him having a problem due to his seizure was much greater than him taking the Dilantin."  Id. at 736.

The Ecks argue that the evidence offered by defendants failed to rebut the presumption that Dr. Rodgers would have read and heeded an adequate warning. The Ecks dispute that Dr. Rodgers or any physician discussed with them Mr. Eck's acetaminophen use prior to his liver failure, and point out that Dr. Rodgers' notes do not reflect such a discussion.  See id. at 278, 731, 800.  However, Mrs. Eck does recall faxing a list of her husband's prescriptions to Dr. Rodgers, and that they discussed the medications he was taking.  The Ecks also point to Dr. Rodgers' testimony that she generally does not "particularly find Tylenol to be effective" and that it "has a number of things that make it less than an attractive drug to use," including its "potential for hepatotoxicity" as evidence that she would have changed her course of treatment.  Id. at 577.

The Ecks construe Dr. Rodgers' "heeding" an adequate warning to mean she would have *given* the warning. However, "'heed' in this context means only that the learned intermediary would have incorporated the 'additional' risk into [her] decisional calculus." Thomas, 949 F.2d at 814. In the risk/benefit analysis of drug prescription, the prescribing physician "can choose to use the product and face its risks, or choose not to use the product and lose its potential benefits. Generally, using the product will present the less risky of these two alternatives." Id. at 813; see also Talley v. Danek Med., Inc., 179 F.3d 154, 163 (4th Cir. 1999) (applying Virginia law) (noting that "the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of [her] patient" and has "the task of weighing the benefits of any medication against its potential dangers").

We also disagree with the Ecks' construction of the burden shifting under the learned intermediary doctrine. Dr. Rodgers testified that even if she knew Mr. Eck was taking a drug with a more frequent hepatotoxicity enzyme, *she would have still prescribed Dilantin to Mr. Eck*. We hold the defendants provided sufficient evidence that Dr. Rodgers would have not changed her course of treatment. See Woulfe, 965 F. Supp. at 1485; Garside, 976 F.2d at 80 ("Where the manufacturer fails to provide the physician with an adequate warning, courts have held that the manufacturer may still be shielded from liability if it can show

-18-

that the prescribing physician would not have heeded an adequate warning."); see also Plummer v. Lederle Labs., 819 F.2d 349, 358-59 (2d Cir. 1987) (applying California law) (granting judgment as a matter of law and noting that "the plaintiff failed to prove that a proper warning would have altered the doctor's conduct").

**C. Did Dr. Rodgers have Substantially the Same Knowledge of Adverse Risks that the Warning Would have Imparted?**

The Ecks next propose that because Dr. Rodgers' testimony did not imply that she had substantially the same knowledge of the adverse risks as the proposed warning would have reflected, her testimony did not demonstrate "unequivocally that s/he knew at the relevant time all the information which would have been included in a warning." Garside, 976 F.2d at 82. Dr. Rodgers testified that she was aware of a "scientific hypothesis" that the hepatotoxicity of acetaminophen is increased when used in conjunction with Dilantin, but she did not appear certain of the interaction between a therapeutic dose of acetaminophen and Dilantin. Aplt's App. vol. II, at 574, 740. Thus, she was unable to incorporate this knowledge into her risk/benefit analysis of Mr. Eck's course of treatment.

The Ecks cite Christopher v. Cutter Labs., 53 F.3d 1184, 1192 (11th Cir. 1995) (applying Florida law) in support of their contention that Dr. Rodgers must have unequivocal knowledge of the effects of the interaction of the drugs. In

-19-

Christopher, the Eleventh Circuit examined whether the plaintiffs had presented substantial evidence that absence of an adequate warning was a proximate cause of the injury. The defendant manufacturer challenged a jury instruction that required the jury to find that, at the time in question, the prescribing physician had a knowledge of "reasonable evidence" of the connection between AIDS and blood products. Id. at 1193. The given warning required only a knowledge that the "possibility exists" that AIDS could be transmitted through blood products. Id. There was no testimony that physicians in general or that the prescribing physician understood that there was reasonable evidence of an association between AIDS and blood products during the relevant timeframe. The Eleventh Circuit held that the district court erred when it required the manufacturer to establish "reasonable evidence" of the risk, which imposed "a higher and erroneous layer of proof on its affirmative defense" and that the error required a new trial. Id. at 1193.

In the present case, we are faced with a very different set of facts: Dr. Rodgers has testified that she is aware that Dilantin is an enzyme inducer, one that could increase the hepatotoxicity of acetaminophen. She also testified that she was aware of the possibility of an adverse reaction when Dilantin and acetaminophen were taken together. Most importantly, she testified that even if she knew Mr. Eck was taking, or might take, a drug with a more frequent

-20-

hepatoxicity enzyme than acetaminophen, she *still would have prescribed* Dilantin, "because the risk of him having a problem due to his seizure was much greater than him taking the Dilantin." Aplt's App. vol. II, at 736. See also Thomas, 949 F.2d at 811-15 (holding that a warning stating that seizures had occurred in 9 of 400,000 patients who had ingested the drug Accutane would not have altered physician's behavior where he testified that he was aware at the time he prescribed the drug of "the possibility that Accutane may have caused seizures in very rare cases"); Plummer, 819 F.2d at 358 (holding that where physician testified he "was aware of the risks of contact polio," a warning stating that an unimmunized person should avoid contact with a polio vaccinee for 30 days would not have altered his behavior); Stanback v. Parke, Davis & Co., 657 F.2d 642, 645 (4th Cir. 1981) (applying Virginia law) (holding that a warning stating that there was a risk of acquiring a neurological disorder from ingesting the drug Fluogen would not have altered physician's behavior where his "decisions and actions [were] made in full knowledge of [that] information"); Windham v. Wyeth Labs., Inc., 786 F. Supp. 607, 612 (S.D. Miss.1992) (applying Mississippi law) (holding that a warning stating that a pregnant patient who uses Phenergan suppositories might suffer adverse consequences would not have altered physician's behavior where he testified that he was aware of such risk and "weighed the risk of the drug against the benefit of the drug" before prescribing

-21-

it).  Cf. Garside , 976 F.2d at 82 (holding where physician's affidavit stated he was aware of "alleged connection" between the combined ingestion of phenobarbital and amoxicillin and the risk of toxic epidermal necrolysis did not suggest the physician knew of the causal connection).

Mr. Eck's reliance on  Tatum v. Schering Corp.  , 795 F.2d 925, 927 (11th Cir. 1996) (applying Alabama law), is similarly misplaced.  There, as in  Garside , the prescribing physician was not adequately warned of the degree or extent of serious adverse effects.  The  Tatum  court held that a jury might have concluded the physician, armed with this knowledge, might have reconsidered her decision to prescribe the drug.  See id.  Here, Dr. Rodgers testified that she still would have prescribed Dilantin, because the risk of seizure was more severe than the risk of hepatotoxicity induction.  Thus, Dr. Rodgers was already aware of the medical risk that the warning would have imparted, and having integrated this knowledge into her risk/benefit calculation, determined her decision to prescribe would remain unchanged.  See e.g. , Garside , 976 F.2d at 80 (collecting cases and stating "[w]here the manufacturer fails to provide the physician with an adequate warning, courts have held that the manufacturer may still be shielded from liability if it can show that the prescribing physician would not have heeded an adequate warning . . . [and] have reasoned that the physician's conduct acts as an intervening-superseding cause of the plaintiff's injury which vitiates any liability

-22-

on the part of the manufacturer"); Stanback, 657 F.2d at 645-46 (stating that "the manufacturer cannot be said to have caused the injury if the doctor already knew of the medical risk"); Wooten v. Johnson & Johnson Prods, Inc., 635 F. Supp. 799, 803 (N.D. Ill.1986) (noting that "[c]ourts have held consistently that a drug manufacturer is entitled to summary judgment where the prescribing physician is aware of the risks associated with a drug") (citing Goodson v. Searle Labs., 471 F. Supp. 546 (N.D. Conn. 1978), and Cobb v. Syntax Labs., 444 So. 2d 203 (La. App. 1983)).

Oklahoma courts have not considered whether a physician's conduct automatically acts as an intervening cause relieving the manufacturer of liability, but instead shifts the burden back to the plaintiff to allow him to controvert the physician's testimony. See Woulfe, 965 F. Supp. at 1485-86. If the Ecks can "produce sufficient evidence to create a triable issue of the question of causation," Garside, 976 F.2d at 81, they will defeat a motion for summary judgment. See Woulfe, 965 F. Supp. at 1485-86 (noting plaintiff was unable to establish that failure to warn was a proximate cause of injuries and granting summary judgment to defendant).

**D. Material Fact Questions Regarding Causation**

Finally, the Ecks contend that even if the defendants successfully rebutted the presumption that a proper warning would have been heeded, they satisfied their burden by presenting sufficient evidence to create a material fact as to causation by casting doubt upon the credibility of Dr. Rodgers. Ordinarily, what constitutes the proximate cause of any injury is a question of fact. See Lefthand v. City of Okmulgee, 968 P.2d 1224, 1226 (Okla. 1998). "However, the question of proximate cause becomes a question of law when the facts are undisputed and there is no evidence from which a jury could reasonably find a causal connection between the allegedly negligent act and the injury." Id.

The Ecks challenge Dr. Rodgers' credibility, and note that she formerly conducted research for several pharmaceutical companies. As the district court observed:

> These facts standing alone, however, merely offer speculation as to Dr. Rodgers' motives for testifying and they are clearly insufficient to call into question either Dr. Rodgers' credibility or the veracity of her statements.

Aplt's App. vol. III, doc. 31, at 8 (Dist. Ct. Order filed Jan. 18, 2000). The speculative nature of this argument is increased by the fact that if anything, Dr. Rodgers' testimony would have enhanced her own exposure to liability. Absent evidence suggesting Dr. Rodgers was otherwise influenced by the defendants, we, like the district court, find no reason to question her credibility or the truth of her testimony.

-24-

Even viewing the facts most favorably to the Ecks, we cannot disagree with the district court's conclusion that Dr. Rodgers would have prescribed Dilantin no matter how carefully the Ecks proposed or refined the phrasing of the suggested warning. Dr. Rodgers testified about her independent knowledge of the risk of the potential interaction between the two drugs, and indicated that if presented with even a higher risk, she would have prescribed Dilantin. The Ecks have failed to controvert this testimony and have failed to create an issue of fact of whether defendants' failure to warn was the proximate cause of their injuries.

## IV. CONCLUSION

We agree with the district court that the Ecks are unable to demonstrate that a warning would have changed Dr. Rodgers' or Dr. Newey's behavior at the time of prescribing Dilantin and Isocet, respectively. The Ecks are, in turn, unable to establish that the alleged failure to warn of the possible adverse reactions between the drugs was the proximate cause of Mr. Eck's injuries. Accordingly, we AFFIRM the district court's grant of summary judgment to defendants.