HORIZON HOLDINGS, L.L.C. f/k/a Horizon Marine L.C.; Geoffrey Pepper; Cassandra O'Tool; and John O'Tool, Plaintiffs,

v.

GENMAR HOLDINGS, INC.; Genmar Industries, Inc.; and Genmar Manufacturing of Kansas, L.L.C., Defendants.

No. 01–2193–JWL.

United States District Court, D. Kansas.

Oct. 2, 2002.

Floyd R. Finch, Jr., Blackwell Sanders
Peper Martin LLP, George A. Hanson,

Todd M. McGuire, Stueve Helder Siegel LLP, Kansas City, MO, Nicole T. Bock, Blackwell Sanders Peper Martin LLP, Omaha, NE, for Plaintiffs.

Timothy K. McNamara, Harlan D. Burkhead, Tedrick A. Housh, III, Rosalee M. McNamara, Lathrop & Gage L.C., Kansas City, MO, Thomas Tinkham, Holly S.A. Eng, Judith Williams–Killackey, Dorsey & Whitney LLP, Minneapolis, MN, for Defendants.

## MEMORANDUM & ORDER

LUNGSTRUM, District Judge.

Plaintiffs filed suit against defendants asserting various claims arising out of defendant Genmar's [1] acquisition of plaintiff Horizon Marine LC. This matter is presently before the court on defendants' motion for summary judgment on plaintiffs' commercial claims (doc. # 110) and defendants' motion for summary judgment on plaintiffs' employment claims (doc. # 111). For the reasons explained below, the motions are granted in part and denied in part.

**Facts**

The following facts are uncontroverted or related in the light most favorable to plaintiffs, the non-moving parties.[2] Plaintiff Geoffrey Pepper has worked in the manufacturing field for 34 years and he has spent 24 years working in the marine industry. Indeed, Mr. Pepper has extensive experience in all aspects of the design, engineering, manufacture and sale of recreational boats. In the spring of 1997, Mr. Pepper and his family, with the financial support of a small group of investors, started their own aluminum boat manufacturing company, Horizon Marine LC.

In that regard, Mr. Pepper convinced his daughter and son-in-law, co-plaintiffs Cassandra O'Tool and John O'Tool, to relocate from Denver, Colorado to Junction City, Kansas in order to help start the business. Upon relocating to Junction City, Ms. O'Tool assumed responsibility for human resources, accounting and certain administrative functions of Horizon Marine. Mr. O'Tool assumed the role of Plant Manager. In essence, Mr. and Mrs. O'Tool assisted and supported all facets of the initial start-up and operations of Hori-

---

1. Defendant Genmar Holdings, Inc. is a Delaware corporation with its headquarters in Minneapolis, Minnesota. Defendant Genmar Industries, Inc. is a wholly-owned indirect subsidiary of Genmar Holdings, Inc. and is also headquartered in Minneapolis. Defendant Genmar Manufacturing of Kansas, LLC is also a wholly-owned subsidiary of Genmar Industries, Inc. For purposes of this order, the court refers to defendants Genmar Holdings, Inc. and Genmar Industries, Inc. collectively as "Genmar." The court refers to defendant Genmar Manufacturing of Kansas, LLC as "GMK."

2. To a large extent, the court's recitation of the facts is taken from an affidavit provided by Mr. Pepper. Defendants object to Mr. Pepper's affidavit for two primary reasons. First, defendants contend that much of Mr. Pepper's affidavit is argumentative; the court agrees and has not considered those portions of the affidavit. It has only considered Mr. Pepper's statements about things concerning which he has personal knowledge and opinions which he has the requisite foundation to offer. Defendants also object to Mr. Pepper's affidavit to the extent it contains "self-serving statements." Essentially, this objection refers to uncorroborated statements of fact or opinion which are favorable to the affiant. As the court has previously explained, this argument reflects a misunderstanding of summary judgment practice. See, e.g., Edwards & Assocs., Inc. v. Black & Veatch, L.L.P., 84 F.Supp.2d 1182, 1186 n. 4 (D.Kan.2000). The court evaluates the validity of an affidavit not by examining whom the affidavit serves, but rather by examining whether the affidavit relates specific, personalized facts within the affiant's knowledge. The "self-serving" portion of Mr. Pepper's affidavit satisfies this burden.

zon Marine. Mr. Pepper's wife, Phyllis, also worked to help the company get "up and running."

With high quality aluminum boats designed by Mr. Pepper and an aggressive marketing strategy, Horizon Marine began making significant inroads into the aluminum boat market. In a short period of time, the Horizon brand of boats gained an impressive presence in the market and enjoyed unusual growth and success for a fledgling company. By the fall of 1998, Mr. Pepper and his company, Horizon Marine, had developed numerous business relationships with a growing network of boat dealers and dealerships.

By the end of 1997, Horizon Marine caught the attention of defendant Genmar. Genmar is headquartered in Minneapolis, Minnesota and describes itself as the world's largest manufacturer of recreational boats. Genmar has approximately 7000 employees, 14 manufacturing centers in the United States and Canada and 1800 independent, authorized dealers. Genmar offers more than 400 different boat models and 16 different boat brands, including Champion, Crestliner, Lund and Ranger brands. Genmar's 16 boat brands account for more than 20 percent of all new boats sold with outboard, sterndrive and inboard power.

In November 1997, Bill Ek, a friend of Mr. Pepper who also works as a consultant to Genmar, "dropped in" on Mr. Pepper in Junction City and toured the Horizon Marine facility. Shortly after touring the facility, Mr. Ek drafted a comprehensive analysis of the aluminum boat market and presented it in memorandum format to Genmar's president and CEO, Grant E. Oppegaard. In his analysis, Mr. Ek identified Horizon Marine as a significant potential competitor of Genmar and remarked that Horizon Marine was "one to watch." Mr. Ek's memorandum concluded with the suggestion that Genmar give Horizon Marine "a very hard look for a possible purchase." Mr. Oppegaard thereafter considered Horizon Marine as a possible Genmar acquisition and dispatched Mr. Ek to determine whether Mr. Pepper was interested in selling his company and joining the Genmar organization.

In early August 1998, Mr. Ek contacted Mr. Pepper and conveyed Genmar's interest in acquiring Horizon Marine and retaining Mr. Pepper as president of the company. For a variety of reasons, Mr. Pepper, at first, was not interested in selling his company to Genmar. Nonetheless, Mr. Pepper decided to hear what Genmar had to offer and agreed to host Mssrs. Oppegaard and Ek at the Horizon Marine facility in Junction City. On August 5, 1998, Mr. Pepper showed Mssrs. Oppegaard and Ek the manufacturing facility and visited with them over the course of a few hours. Apparently impressed with Mr. Pepper and his aluminum boat manufacturing operation, Mr. Oppegaard emphasized to Mr. Pepper the advantages of selling his company and joining the Genmar organization.

Immediately upon his return to Minneapolis, Mr. Oppegaard wrote a confidential memorandum to various Genmar board members and executives detailing his findings and recommendations with respect to Horizon Marine and Mr. Pepper. In the memorandum, Mr. Oppegaard cautioned that Horizon Marine "will be a major competitor if left alone to grow," and that the Horizon product line was "competitive with [Genmar's] current Crestliner and Lund product lines." Mr. Oppegaard also commented on Horizon Marine's central location, physical facility, engineering capabilities, dealer network, management and employees. In short, Mr. Oppegaard concluded in his memorandum that he had "found the plant, the people and the loca-

tion for Genmar to expand into the Southern market."

Genmar then invited Mr. Pepper and his principal investor, Robert K. Weary, to submit a general outline of the sort of transaction that Mr. Pepper would be willing to consider, which would then serve as a tentative proposal upon which to base further negotiations. On August 11, 1998, Mssrs. Pepper and Weary traveled to Minneapolis and presented a proposal to Genmar. The proposal emphasized that any deal would have to contain the following key components: that Genmar pay a fair price for Horizon Marine; that Mr. Pepper continue as president and retain complete control of the production and management of the company; and that Mr. Pepper's daughter and son-in-law, Mr. and Mrs. O'Tool, continue their employment and management roles within the company.

After the presentation of this proposal, a group of Genmar executives traveled to Junction City to tour the Horizon Marine facility and meet with Mr. Pepper. During this visit, Genmar presented a counterproposal to Mr. Pepper which included an "earn-out" concept. Generally speaking, Genmar proposed a transaction by which Genmar would purchase Horizon Marine by paying some money up front and then paying an earn-out that would provide Mr. Pepper more money based on a percentage of profits from the production and sale of certain boats, engines and other products from the Junction City, Kansas location. Uncertain about whether the up-front money and earn-out concept proposed by Genmar would result in the realization of a fair price for Horizon Marine, Mr. Pepper sought specific assurances with respect to the obtainability of the proposed earn-out. In response, Mr. Oppegaard and other Genmar executives repeatedly assured Mr. Pepper that the earn-out would, in fact, be obtainable and that Mr. Pepper would

have a fair and genuine opportunity to realize the earn-out consideration proposed by Genmar.

The earn-out concept was not Mr. Pepper's only concern in pursuing a transaction with Genmar. Mr. Pepper also sought assurances with respect to Genmar's commitment to the Horizon brand of boats, the extent of management control and authority that Mr. Pepper would have as president, and Genmar's overall commitment to Mr. Pepper and his family. In response, Mr. Oppegaard and other Genmar executives affirmatively represented to Mr. Pepper that Genmar would support the manufacture, production, marketing, distribution and sale of the Horizon brand of boats; that Genmar would support Mr. Pepper as president of the newly formed Genmar Manufacturing of Kansas, LLC ("GMK"); that Genmar was committed to the growth and expansion of the Horizon brand of boats and would only expect GMK to produce other Genmar brand boats, such as Rangers and Crestliners, to the extent such production would not interfere with Genmar's commitment to the Horizon brand of boats; that Genmar was committed to continuing a relationship with Mr. Pepper's family and specifically approved Mr. and Mrs. O'Tool becoming key employees in the new company; and that Genmar was making a long-term commitment to Mr. Pepper, his family and the new company.

Mr. Pepper agreed to sell the operating assets of Horizon Marine to Genmar in December 1998. The new company was called Genmar Manufacturing of Kansas ("GMK"). The purchase price as set forth in the agreement was made up of two separate components-cash consideration of $2.3 million and earn-out consideration of up to $5.2 million. The $2.3 million cash consideration was paid up front at the time of the closing, which allowed Mr. Pepper

to pay off his initial investors and retire certain other debt, leaving only a modest amount for Mr. Pepper personally. The earn-out provision provided for a five-year earn-out consideration period from and after the closing of the deal. Additional payments would be made to Mr. Pepper in an amount equal to a percentage of all annual gross revenues of the GMK facility, subject to achieving certain gross profit percentages set forth in the purchase agreement from the sale of (1) Horizon (or any direct successor) brand boats, trailers, pre-rigging, parts and accessories, including credit based on the annual published dealer list price of the engine if the boat was sold with an engine; and, in the event other brands were built, (2) Genmar Holdings' brand boats, but excluding any credit for the sale of engines for such boats.

According to Mr. Pepper, then, it was critical that the emphasis and priority of GMK be focused on the production of Horizon brand boats because of the significant revenue credited in the earn-out formula for engines, trailers and other accessories sold with the Horizon brand. Mr. Pepper expected to focus his efforts as president of GMK on building and selling primarily Horizon boats and Genmar gave its assurances that these efforts would be fully supported and encouraged. Relying on these assurances from Genmar, as well as his extensive experience in the manufacturing, engineering and marketing of aluminum boats, Mr. Pepper was confident that he would realize the $5.2 million earn-out over the five-year period. Of course, Mr. Pepper knew that the earn-out consideration was not a "guarantee," as it was contingent on certain profits, but he nonetheless felt confident that he could achieve the necessary numbers based on his experience and with the assistance of Genmar.

During this same time period, Mr. Pepper, Mr. O'Tool and Ms. O'Tool each entered into employment and non-compete agreements with Genmar. According to Mr. Pepper, Genmar represented to him during the negotiations concerning his employment agreement that the agreement would allow Mr. Pepper to run the GMK facility and make decisions that Mr. Pepper thought were appropriate for GMK's operational and financial success and necessary for the realization of his earn-out. Prior to agreeing to sell Horizon Marine, Mr. Pepper asked other Genmar boat company presidents, including Crestliner's Al Kuebelbeck, Ranger's Randy Hopper and Lund's Larry Lovold about their experience working with Genmar corporate and was assured that they enjoyed significant independence and that corporate did not interfere with their operations.

Mr. Pepper avers that within a few months of the sale of Horizon Marine, Genmar began interfering with Mr. Pepper's operations of GMK and began undermining Mr. Pepper's authority as president of GMK. By way of example, Genmar ordered, over the objection of Mr. Pepper, a change in the brand name of boats originally designed and manufactured by Mr. Pepper from "Horizon" to "Nova." According to Mr. Pepper, the change in brand name caused confusion among dealers and customers and negatively impacted sales. According to defendants, they had to change the name from Horizon due to trademark issues. Defendants further contend that in April 1999, Mr. Pepper wrote to Mr. Oppegaard that the name change had had little impact on dealer relationships. In any event, during this same time frame, Genmar also directed that the new Nova line be marketed as an entry level boat, which was not the same market segment in which the Horizon brand had been successful.

Mr. Pepper further avers that Genmar ordered Mr. Pepper and the GMK facility to begin manufacturing two other brands of boats, the Ranger and Crestliner brands, and to give priority to the manufacture of these boats (particularly the Ranger brand) over the manufacture of the Nova brand. According to Mr. Pepper, this shift in priority in favor of other Genmar brand boats directly contradicted Genmar's representations during negotiations. Mr. Pepper maintains that he was the only Genmar boat company president who did not have even basic operational authority, including the authority to decide what type of boats would be built in his plant. Mr. Pepper avers that he was treated by Genmar as little more than a production foreman.

In early May 1999, Mark Zwicker, the production manager of Genmar's Ranger aluminum operation, had breakfast with Nova's director of sales, Scott Flick, while Mr. Zwicker was visiting the GMK facility in Junction City. Apparently, GMK had been experiencing some difficulty with prototyping Ranger's 15 different boat models due to numerous design changes, additional materials and other change orders dictated by Ranger. Upset with the problems GMK was having producing Ranger boats, Mr. Zwicker told Mr. Flick, "I hope you guys can figure out what this company was bought for … and that is to build Ranger boats. If you think you have problems now, just wait until the dealer meeting when you have to answer to our 150 dealers who want their product immediately."

Mr. Flick thereafter conveyed Mr. Zwicker's comment to Mr. Pepper and GMK's chief financial officer, Tom Balek. Mssrs. Flick, Pepper and Balek then contacted Genmar's senior vice-president, George Sullivan, to convey their concern with respect to Mr. Zwicker's comment.

According to Mr. Pepper, he was particularly troubled by the comment regarding the reason Genmar bought Horizon Marine because it was so inconsistent with the representations made to him prior to the sale. Mssrs. Flick, Pepper and Balek also discussed with Mr. Sullivan other challenges the GMK facility was facing in terms of producing Ranger and Crestliner boats.

At that point, Mr. Sullivan drafted a memorandum to Mr. Oppegaard in which he stated that GMK management was "furious" and felt that Mr. Zwicker's comments, if true, suggested that "they had been deluded by Genmar in terms of why they were purchased." Mr. Sullivan also detailed for Mr. Oppegaard the various challenges GMK was facing with respect to the production of Ranger and Crestliner boats. Specifically, Mr. Sullivan noted that GMK was having difficulty prototyping Ranger's 15 aluminum boat models due to design changes, additional materials and other change orders. Mr. Sullivan conveyed to Mr. Oppegaard that GMK wanted to "forget about Ranger and go on with building Nova." Mr. Sullivan further noted that the production of Crestliner boats was also difficult as GMK was not yet able to build Crestliner boats at "standard cost" because of "untrained people, a shortage of welders and the resulting poor plant efficiencies." Mr. Sullivan also conveyed Mr. Pepper's concern that GMK was "committing financial suicide" due to the production requirements for Ranger and Crestliner brand boats.

In response to the concerns identified in Mr. Sullivan's memorandum, Mr. Oppegaard drafted a memorandum that was circulated to several Genmar executives and GMK's management, including Mr. Pepper. In that memorandum, Mr. Oppegaard stated that Genmar purchased Horizon Marine to give Genmar a Southern

location from which to accomplish a number of goals, including moving Ranger boats and Crestliner jon boats out of the Crestliner plant to allow Crestliner to manufacture more Crestliners; building an aluminum Ranger boat that was different from Crestliner; expanding the Horizon/Nova line and dealer network; helping Lund and Crestliner penetrate the Southern market; and building $20 million in sales on aluminum product manufactured at the Junction City plant. Mr. Oppegaard also emphasized that "Genmar measures Nova performance by the overall sales and profit obtained by Genmar of products coming out of Nova's plant no matter what name is on the boat." According to Mr. Pepper, in sharp contrast to Mr. Oppegaard's statement, the brand of boat coming out of GMK was highly significant as it bore directly on Mr. Pepper's ability to realize his earn-out. Specifically, engine credits (which, according to Mr. Pepper, amounted to as much as 50 percent of revenue) were only given for the sale of Nova brand boats and such credits were excluded for Ranger and Crestliner boats in the earn-out formula. After receiving Mr. Oppegaard's memorandum, Mr. Pepper drafted a response setting forth in detail the challenges faced by GMK from both a production and budget standpoint.[3] Mr. Pepper also pleaded with Mr. Oppegaard to address the detrimental effect the Ranger and Crestliner production was having on the production on Nova boats. For example, Mr. Pepper noted that some prior Nova dealers were no longer ordering Nova boats because of GMK's inability to deliver the boats in a timely fashion—an inability that stemmed directly from GMK's difficult, inefficient and time-consuming production of Ranger boats. Mr. Pepper avers that Mr. Oppe-

gaard nonetheless continued to mandate that production priority be given to Ranger and Crestliner boats.

Prior to the acquisition, Mr. Pepper understood that Genmar might ask him to build some number of aluminum boats for Genmar's other boat companies. The Horizon Marine facility was large enough to take on additional capacity and, at an October 1998 meeting with representatives from Genmar's other boat companies, the possibility of Mr. Pepper assisting in the production of other brands was discussed. Mr. Pepper even thought that such production would be a welcome task as it would assist the new company in absorbing overhead costs. According to Mr. Pepper, however, no specific numbers were ever agreed upon among the parties, although defendants contend that Mr. Pepper knew the number would be in the range of 500 to 1500 boats per year. Mr. Pepper further avers that if he had known what the actual production numbers would be for Genmar's other brands, he never would have agreed to an earn-out provision that provided no credit for engines, trailers and accessories for production of sister brand boats.

In August 1999, an individual named Steve Hansley was considering joining GMK as GMK's vice-president of finance to replace Mr. Balek. During an interview with Genmar's chief financial officer, Roger Cloutier, Mr. Hansley asked Mr. Cloutier about the "mission" of GMK. Mr. Cloutier allegedly replied that GMK's first priority was to build Ranger boats. According to Mr. Pepper, he never would have agreed to sell his company if Genmar had told him that the mission of the new company was to build Ranger boats. As

---

3. According to defendants, Mr. Pepper's response also indicates that he was aware, prior to the acquisition, of the five purposes of the acquisition as set forth by Mr. Oppegaard in his memorandum.

further evidence of Genmar's alleged intentions, plaintiffs highlight the contents of a videotape created by Ranger president Randy Hopper and Mr. Oppegaard. This informational videotape (for use by Ranger dealers) concerned the development of Ranger's aluminum product line and the move from the Crestliner plant to the GMK facility. On the videotape, Mssrs. Hopper and Oppegaard discuss Genmar's goal of obtaining for Ranger "a manufacturing plant of [its] own" and suggest that the goal was accomplished in the acquisition of Horizon Marine.

In August 1999, Mr. Vigdal began traveling to Junction City on a regular basis to visit the GMK facility. According to Mr. Pepper, Mr. Vigdal used these trips to further undermine Mr. Pepper's authority and frustrate Mr. Pepper's efforts to meet the operational challenges faced by GMK. Mr. Pepper further avers that Mr. Vigdal's presence in Junction City had a negative effect on the morale of GMK's management and personnel. Defendants' evidence, on the other hand, shows that Mr. Vigdal traveled to Junction City to investigate and assist with the performance problems that the GMK facility was experiencing. Mr. Vigdal continued to visit the GMK facility throughout the fall of 1999. During this same time frame, Mssrs. Oppegaard and Vigdal began discussing the possibility of replacing Mr. Pepper as president of GMK.

On December 21, 1999, Mr. Pepper, at the request of Mssrs. Oppegaard and Vigdal, traveled to Genmar's headquarters in Minneapolis for a meeting with Mssrs. Oppegaard and Vigdal. Several issues were discussed during this meeting, including annual raises and the reorganization of GMK's management structure. According to Mr. Pepper, when discussing whether Ms. O'Tool, who was pregnant at the time, should receive an annual raise,

Mr. Vigdal stated, "Well, she's not coming back to work so she's not getting a raise anyway, she's pregnant, she's leaving, she's not getting a raise anyway." In fact, Ms. O'Tool had not announced that she was not coming back to work after her maternity leave and intended on returning to work. In any event, it is uncontroverted that Ms. O'Tool did not receive an annual raise in January 2000. With respect to the reorganization of GMK's management structure, Mssrs. Oppegaard and Vigdal advised Mr. Pepper that they were considering the possibility of transitioning Mr. Pepper out of his position as president of GMK and into an engineering position. While the details of the engineering position were not discussed during the meeting, Mr. Oppegaard suggested that Mr. Vigdal and Mr. Pepper get together to discuss the proposed change at some future date.

Mr. Oppegaard also announced during the December 21, 1999 meeting that GMK would cease production of Nova pontoon and deckboats. According to Mr. Pepper, this decision was "devastating and demoralizing" as these particular boats were popular and were a critical component of Mr. Pepper's strategy to make the earnout. By contrast, Mr. Oppegaard testified that he made the decision because GMK was losing money on these particular boats, no one was buying these boats, the boats could not be manufactured at a reasonable cost and they had warranty problems.

In January 2000, Mr. Vigdal provided Mr. Oppegaard with a "Nova status report" concerning the GMK facility. In that report, Mr. Vigdal noted that he had not started to recruit any individuals for the position of president of GMK because he was "not sure that we will have an operation that will require a high level position." Mr. Vigdal further expressed

his significant doubts as to whether GMK had the capability of producing a complete Nova line in addition to the boats for the sister companies. In his report, Mr. Vigdal seems to entertain the possibility of eliminating the Nova brand altogether and "converting the current Nova dealers to Lund or Crestliner dealers." According to Mr. Pepper, the elimination of the Nova brand, as contemplated by Mr. Vigdal, would ensure that Mr. Pepper would never realize his earn-out.

In early February 2000, Ms. O'Tool confronted Mr. Vigdal about his decision to not give Ms. O'Tool a raise. Mr. Pepper had relayed to his daughter the comments allegedly made by Mr. Vigdal during the December 21, 1999 meeting concerning Ms. O'Tool's pregnancy. When Ms. O'Tool specifically accused Mr. Vigdal of refusing to give her a raise because of her pregnancy, Mr. Vigdal denied making any such comments during the December 21, 1999 meeting.

In late February 2000, Mr. Vigdal again discussed with Mr. Pepper the possibility of Mr. Pepper taking on engineering position and replacing him as president of GMK. Mr. Pepper avers that he was resistant to the idea for a number reasons, primarily because he was never given any details about the engineering position, he assumed it would be a demotion, and he assumed the position would be responsible for only GMK and report to a chief operating officer rather than to a senior Genmar executive. Because of the lack of detail and the assumed demotion in reporting relationship and possibly compensation, Mr. Pepper told Mr. Vigdal on February 24, 2000 that he was not interested in being an engineer with GMK and working

for a COO. However, Mr. Pepper emphasizes that Genmar never offered Mr. Pepper a specific engineering position and, thus, Mr. Pepper never declined such a position. According to Mr. Pepper, if a bona fide offer had been made to him, he would have considered the position. During this same conversation on February 24, 2000, Mr. Pepper and Mr. Vigdal discussed the possibility of moving John O'Tool to another position. They also discussed the possibility of having Genmar offer severance packages to Mr. and Ms. O'Tool and ending Genmar's relationship with Mr. and Ms. O'Tool altogether.

On March 13, 2000, Mr. Pepper sent a letter via facsimile to Mr. Vigdal concerning Genmar's decision to deny Ms. O'Tool a raise. In the letter, Mr. Pepper advised Mr. Vigdal that the decision regarding Ms. O'Tool's raise violated state and federal anti-discrimination laws as well as the Family and Medical Leave Act. Mr. Pepper urged Mr. Vigdal to reconsider the decision. Upon receiving the letter, Mr. Vigdal contacted Mr. Pepper by telephone and, ultimately, told Mr. Pepper to give Ms. O'Tool the raise and to make it retroactive to January 2000. Within two days of this conversation, on March 15, 2002, Mr. Vigdal had a resume sent to him from a recruiting agency with information on a potential candidate to replace Mr. Pepper as president of GMK. According to Mr. Vigdal, however, he had made contact with the recruiting firm prior to receiving Mr. Pepper's letter.[4]

Sometime in early 2000, Mr. Pepper consulted a law firm in Kansas City to discuss his situation and his family's situation with Genmar. On March 31, 2000, counsel for Mr. Pepper sent to Mr. Oppegaard a de-

---

4. Following up on the resume received on March 15, 2000, Mr. Vigdal interviewed Larry Jensen for the position of president of GMK in mid-March 2000 and offered Mr. Jensen the position on March 27, 2000. On March 28, 2000, Mr. Jensen accepted the position and he was scheduled to assume the position on April 10, 2000.

tailed letter protesting on behalf of Mr. Pepper and his family the alleged unlawful discriminatory practices and alleged improper commercial dealings committed by Genmar. Mr. Pepper's counsel also advised Mr. Oppegaard to "direct all future communications concerning [Mr. Pepper's] employment to us." Just five days later, on April 5, 2000, Mr. Vigdal arrived in Junction City and terminated the employment of Mr. Pepper, Mr. O'Tool and Ms. O'Tool in individual meetings with each plaintiff. According to plaintiffs, Mr. Vigdal specifically referenced the March 31, 2000 letter during their termination meetings. Mr. Pepper, for example, testified that Mr. Vigdal said to him during the termination meeting, "In light of the fact that you lost $3 million and the fact that your attorney sent a letter and we can't talk to you anymore, we're terminating you." Similarly, Ms. O'Tool averred that Mr. Vigdal told her and that she being terminated "in light of the situation with Geoff and the letter that had been received from our lawyer the Friday before." Mr. O'Tool testified that Mr. Vigdal told him, "In light of what took place last week, we're going to terminate your employment."

Shortly after her termination on April 5, 2000, Ms. O'Tool gave birth to her second child. Mr. O'Tool began looking for new employment and eventually secured a job with a custom door manufacturing company near Hastings, Minnesota. In August 2000, the O'Tools left Junction City and moved to Hastings, where they reside today. Mr. Pepper has done some consulting work since his termination but has been constrained by the non-compete agreement he signed with Genmar.

After terminating the employment of Mr. Pepper, Mr. O'Tool and Ms. O'Tool, Genmar eventually discontinued the Nova brand of boats and converted Nova dealers to other Genmar aluminum boat brands. According to plaintiffs, Genmar continued to manufacture the Nova boat designs but did so under the label of other Genmar boat brands, including Ranger, Crestliner, Lowe and Lund brands. During this same time frame, Genmar decided to discontinue the Ranger aluminum product line previously manufactured at GMK. Moreover, Genmar had, in March 2001, acquired the Lowe boat brand and its manufacturing facility in Lebanon, Missouri. With a facility in Lebanon, Missouri and the discontinuation of the Ranger aluminum product line, Genmar decided to shut down the GMK facility. Significant lay-offs at the GMK facility began in March 2001 and in March 2002 Genmar began dismantling the facility. GMK manufactured its last boat on May 17, 2002.

To date, Mr. Pepper has received no earn-out consideration. Genmar contends that no such consideration is owed to Mr. Pepper as the gross profit percentages necessary to trigger earn-out consideration under the purchase agreement were never achieved. In any event, in connection with plaintiffs' commercial claims, plaintiffs seek damages in the amount of $5.2 million (*i.e.*, the full amount of the earn-out consideration) in addition to punitive damages. In connection with their employment-related claims, plaintiffs seek back pay, front pay, compensatory and punitive damages as well as recovery of attorneys' fees and costs.

## II. · Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. Unit-*

*ed Transp. Union,* 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.,* 259 F.3d 1226, 1231–32 (10th Cir.2001) (citing *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. American Guarantee & Liability Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler,* 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Oklahoma,* 218 F.3d 1190, 1197–98 (10th Cir.2000) (quoting *Adler,* 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibits incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and in-expensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

● Plaintiffs' Employment Claims

In the pretrial order, the individual plaintiffs assert various claims against defendants relating to their employment with and discharge from GMK. Specifically, Ms. O'Tool claims that defendants denied her a raise based on her pregnancy and thereafter terminated her employment based on her pregnancy in violation of Title VII and the Kansas Act Against Discrimination (KAAD), K.S.A. § 44–1001 et seq.[5] Mr. Pepper and Ms. O'Tool further assert that defendants retaliated against them by terminating their employment based on Mr. Pepper's and Ms. O'Tool's protected activity (*i.e.,* complaining about defendants' allegedly unlawful conduct). Mr. Pepper's and Ms. O'Tool's retaliation

---

**5.** The court will not specifically address plaintiffs' KAAD claims in analyzing plaintiffs' claims but simply applies the same standards and burdens to plaintiffs' KAAD claims as those applied to plaintiffs' Title VII claims and reaches the same conclusions under both statutes. *See Aramburu v. Boeing Co.,* 112 F.3d 1398, 1403 n. 3 (10th Cir.1997).

claims are asserted under both Title VII and the KAAD. Mr. O'Tool asserts a claim under Title VII and the KAAD for "third-party" retaliation. That is, Mr. O'Tool claims that defendants retaliated against him by terminating his employment based on the protected activity of other persons—Mr. Pepper, his father-in-law, and/or Ms. O'Tool, his wife. Finally, the individual plaintiffs each assert two claims under state law—a claim for retaliatory discharge and a claim for breach of contract based on defendants' alleged breach of plaintiffs' employment agreements.

Defendants move for summary judgment on each of plaintiffs' employment claims except for plaintiffs' state law claims for retaliatory discharge. While defendants identified plaintiffs' state law wrongful discharge claims in one of the headings in their brief (*i.e.*, "Defendants Did Not Breach the Individual Plaintiffs' Employment Agreements or wrongfully Discharge Them"), defendants did not address the merits of that claim at any point in their papers. After plaintiffs highlighted this oversight in their response, defendants urged in their reply that plaintiffs have never asserted a wrongful or retaliatory discharge claim separate and apart from their breach of contract claim. The court disagrees and notes that plaintiffs, in the pretrial order, specifically set forth the elements of their retaliatory discharge claim at page 75. Perhaps more significant, however, is the fact that defendants, in the pretrial order at page 76, set forth as an issue of law to be resolved by the court whether plaintiffs' retaliatory discharge claim is actionable when plaintiffs have available relief under Title VII and/or the KAAD—an argument that they assert in their reply brief. Thus, the court concludes that defendants had actual knowledge that plaintiffs were asserting a separate state law claim for retaliatory discharge. Because defendants have not analyzed that claim in any respect in their memorandum in support of their motion for summary judgment, the court declines defendants' invitation (set forth in their reply brief) to grant summary judgment on the claim without providing plaintiffs with an opportunity to present evidence and arguments in support of the claim.

■ That having been said, however, the court notes that in *Polson v. Davis,* the Tenth Circuit held that the Kansas Supreme Court would not allow a common law cause of action for retaliatory discharge when an adequate statutory remedy exists under Kansas law. 895 F.2d 705, 709–10 (10th Cir.1990) ("[W]e believe ... that the Kansas Supreme Court would adopt the view that KAAD provides an adequate and exclusive state remedy for violations of the public policy enunciated therein."). Moreover, the Tenth Circuit has expressly held that the *Polson* rationale extends to plaintiffs seeking to assert a common law cause of action for retaliation when they have a federal statutory right. *See Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1399 (10th Cir.1997) (citing *Masters v. Daniel Int'l Corp.,* 917 F.2d 455, 457 (10th Cir.1990)). In fact, the Kansas Supreme Court has acknowledged the Tenth Circuit's *Polson* decision and concluded that the Circuit "was correct in surmising the Kansas rule to be that an adequate alternative remedy precludes a common-law retaliatory discharge action." *See Flenker v. Willamette Indus., Inc.,* 266 Kan. 198, 209, 967 P.2d 295 (1998); *see also Coleman v. Safeway Stores, Inc.,* 242 Kan. 804, 752 P.2d 645 (1988) (assuming that an adequate alternative remedy would preclude a common law cause of action for retaliatory discharge). In light of these principles, the court anticipates that plaintiffs' state law claims for retaliatory discharge would be an appropriate subject of

a Rule 50 motion filed by defendants at the close of plaintiffs' case.[6]

The court turns, then, to address plaintiffs' remaining employment claims and, more specifically, to the reasons that defendants assert they are entitled to summary judgment on those claims.

● Ms. O'Tool's Pregnancy Discrimination Claims

■ Ms. O'Tool contends that Genmar refused to give her a raise and later terminated her employment based on her pregnancy. Ms. O'Tool's claim is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) (amending Title VII to state that discrimination "because of sex" includes discrimination based on pregnancy). Claims brought under the Pregnancy Discrimination Act are analyzed in the same way as other Title VII claims of disparate treatment. *See EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir.2000) (citing *EEOC v. Ackerman, Hood & McQueen, Inc.*, 956 F.2d 944, 947 (10th Cir.1992)). To prevail under Title VII, a plaintiff must show, through either direct or indirect evidence, that the discrimination complained of was intentional. *See id.* (citing *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir.1999). A plaintiff who lacks direct evidence of intentional discrimination may use the burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to demonstrate intentional discrimination. *See id.*

■ With respect to Ms. O'Tool's claim that she was denied a raise, defendants contend, utilizing the *McDonnell Douglas* framework, that Ms. O'Tool can establish neither a prima facie case of discrimination nor pretext. Ms. O'Tool, however, has come forward with direct evidence that defendants denied her a raise because of her pregnancy such that defendants' reliance on the *McDonnell Douglas* framework is misplaced. In that regard, Mr. Pepper testified that during the December 21, 1999 meeting at Genmar's corporate headquarters, the issue of raises was discussed among Mr. Pepper, Mr. Oppegaard and Mr. Vigdal. According to Mr. Pepper, Mssrs. Oppegaard and Vigdal began inquiring of Mr. Pepper whether Ms. O'Tool intended to return to work after her maternity leave. After Mr. Pepper suggested that Mssrs. Oppegaard and Vigdal direct such questions to Ms. O'Tool, Mr. Vigdal allegedly stated, "Well, she's not coming back to work so she's not getting a raise anyway, she's pregnant, she's leaving, she's not getting a raise anyway."

While Mr. Vigdal denies making this comment, the court must give the benefit of the doubt to Ms. O'Tool at this stage in the proceeding. Viewing the evidence in the light most favorable to Ms. O'Tool, defendants in fact relied on Ms. O'Tool's pregnancy in deciding to deny Ms. O'Tool a raise. Under Tenth Circuit precedent, such evidence constitutes direct evidence of discrimination. *See Ramsey v. City & County of Denver*, 907 F.2d 1004, 1008 (10th Cir.1990) (a plaintiff proves discrimination by direct evidence when she presents proof, *inter alia*, that the employer actually relied on a protected characteris-

---

**6.** Defendants also highlight in their reply brief that a state law retaliatory discharge claim is an exception to the employment-at-will doctrine and, thus, is not applicable here because the individual plaintiffs each had employment contracts and those contracts were not at-

will. Should defendants choose to file a Rule 50 motion with respect to plaintiffs' state law retaliatory discharge claim, the court encourages defendants (and plaintiffs, in response) to brief this issue and to direct the court to pertinent case law on the issue.

tic in making its employment decision). Because Ms. O'Tool has set forth sufficient direct evidence of discrimination, the court need not engage in the *McDonnell Douglas* analysis urged by defendants. Moreover, as Ms. O'Tool has provided sufficient evidence to create a triable issue as to whether her pregnancy motivated defendants' decision regarding her raise, defendants' motion for summary judgment with respect to this claim is denied. *See McGarry v. Board of County Comm'rs of County of Pitkin,* 175 F.3d 1193, 1200 & n. 4 (10th Cir.1999) (district court erred in granting summary judgment to defendant where plaintiff came forward with direct evidence of discrimination).[7]

■ The court turns, then, to Ms. O'Tool's claim that defendants terminated her employment, at least in part, because of her pregnancy. In the absence of direct evidence of discrimination, a plaintiff relies on the *McDonnell Douglas* methodology and bears the initial burden of establishing a prima facie case by a preponderance of the evidence. *See EEOC v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184, 1191 (10th Cir.2000) (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). By establishing her prima facie case, the plaintiff raises a rebuttable presumption that the defendant unlawfully discriminated against her. *See id.* (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d

407 (1993)). The burden of production then shifts to the defendant who must articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff. *See id.* (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the defendant is able to articulate a facially nondiscriminatory reason for the adverse employment action, the plaintiff can avoid summary judgment only if she can show that her "pregnancy was a determinative factor in the defendant's employment decision, or show the defendant's explanation for its action was merely pretext." *Id.* (quoting *Atchley v. Nordam Group, Inc.,* 180 F.3d 1143, 1148–49 (10th Cir.1999)).

In their motion for summary judgment, defendants first maintain that Ms. O'Tool cannot establish a prima facie case of discriminatory discharge because "after her termination the only remaining employee in human resources in Junction City was a female, Melissa Marshall." Such evidence might arguably be relevant if Ms. Marshall were pregnant at the time she was retained as it would tend to show that defendants did not bear any discriminatory animus toward pregnant employees. But the mere fact that a female was retained in the human resources department has no bearing on Ms. O'Tool's claim. Ms. O'Tool is not claiming that she was terminated because of her gender but, more specifically, that she was terminated because of her pregnancy. Thus, the court disregards de-

---

**7.** According to defendants, Ms. O'Tool did not suffer an adverse employment action with respect to her raise because defendants eventually gave Ms. O'Tool a raise and made it retroactive to the date when she would otherwise have received it. The court has previously rejected analogous arguments and, for the same reasons, does so here. *See Kennedy v. General Motors Corp.,* 226 F.Supp.2d 1257 (D.Kan.2002) (rejecting defendant's argument that disciplinary suspensions were not adverse employment actions where they were

ultimately cleared from record and defendant agreed to pay plaintiff for all lost time); *Reese v. Owens–Corning Fiberglas Corp.,* 31 F.Supp.2d 908, 914–15 (D.Kan.1998) (rejecting defendant's argument that plaintiff's loss-of-seniority claim was rendered moot where plaintiff's seniority was restored through the grievance process); *see also Roberts v. Roadway Express, Inc.,* 149 F.3d 1098, 1104 (10th Cir.1998) (recognizing that employment actions can be adverse even if such actions are subsequently withdrawn).

fendants' argument concerning the retention of Ms. Marshall.

Defendants next challenge Ms. O'Tool's discriminatory discharge claim on the grounds that Ms. O'Tool cannot provide evidence that defendants' proffered reasons for Ms. O'Tool's discharge are pretextual. According to defendants, they discharged Ms. O'Tool because she was part of a senior management team that failed to produce expected results; because the GMK facility experienced a high turnover rate in personnel, which exacerbated productivity problems and for which Ms. O'Tool was directly responsible; and because defendants were uncomfortable retaining Ms. O'Tool while at the same time terminating the employment of her father and her husband-in other words, defendants doubted whether Ms. O'Tool would remain loyal to and productive for defendants after her family members were discharged.

Based on the evidence in the record before the court, viewed in the light most favorable to Ms. O'Tool, a reasonable jury could conclude that Ms. O'Tool's discharge was based, at least in part, on her pregnancy. Significantly, the record reflects that Mr. Vigdal, who was involved in the decision to deny Ms. O'Tool a raise and allegedly did so based on Ms. O'Tool's pregnancy, was also a key decisionmaker with respect to Ms. O'Tool's discharge. Because of this link, the court cannot analyze Ms. O'Tool discharge in a vacuum; her discharge must be analyzed in the context of the entire chain of seemingly related events that began with the initial decision regarding Ms. O'Tool's raise and Mr. Vigdal's alleged comment concerning Ms. O'Tool's pregnancy, plaintiffs' subsequent complaints about the motivation underlying that decision, and the discharge of all the individual plaintiffs following (and arguably because of) those complaints. In short, Ms. O'Tool's discriminatory discharge claim must be resolved by a jury.

● Ms. O'Tool's and Mr. Pepper's Retaliation Claims

Ms. O'Tool and Mr. Pepper contend that defendants terminated their employment in retaliation for their complaints of discrimination, including Ms. O'Tool's oral complaint to Mr. Vigdal concerning her raise; Mr. Pepper's written complaint concerning Ms. O'Tool's raise in his March 13, 2000 letter to Mr.Vigdal; and Mr. Pepper's counsel's March 31, 2000 letter to defendants. The individual plaintiffs' retaliation claims are grounded primarily on their evidence that Mr. Vigdal, at the time he terminated each plaintiff, made specific reference to the letter from Mr. Pepper's counsel.

■ Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e–3(a). To prevail on a retaliatory discharge claim, a plaintiff must establish that the decision to terminate him or her resulted from retaliatory animus. *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 549 (10th Cir. 1999). A plaintiff may meet that burden in two ways. *Id.* Typically, a plaintiff will rely on the familiar framework enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)—the method urged by defendants here in their papers. *See id.* However, the plaintiff may also establish discrimination directly, in which case the *McDonnell Douglas* framework is inapplicable. *Id.* at 550 (citing *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557–58, 560 (10th Cir.1996)). To prevail using this direct method, a plaintiff must introduce direct or circumstantial evidence that the alleged retaliatory motive "actually relate[s] to the

question of discrimination in the particular employment decision, not to the mere existence of other, potentially unrelated, forms of discrimination in the workplace." *Id.* (citations and quotations omitted); *see also Thomas v. Denny's, Inc.,* 111 F.3d 1506, 1512 (10th Cir.1997) (holding that plaintiff may prove discriminatory motive by "presenting 'evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged [retaliatory] attitude' ").

■ Here, both Ms. O'Tool and Mr. Pepper have presented evidence that retaliation played a motivating part in defendants' decision to discharge them and that evidence is sufficient for the submission of plaintiffs' retaliation claims to the jury. In so finding, the court relies in large part on the Tenth Circuit's opinion in *Medlock v. Ortho Biotech, Inc.,* 164 F.3d 545 (10th Cir.1999). After a jury returned a verdict for plaintiff on his retaliation claim, the defendant moved for judgment as a matter of law, which was denied. On appeal, the Tenth Circuit held that plaintiff's evidence was sufficient to support the jury's verdict. The Circuit summarized plaintiff's evidence as follows:

> One month after plaintiff's deposition, during which he testified about his race discrimination claim, defendant sent a letter to plaintiff, stating: "As a result of issues raised in your deposition, effective immediately, you are suspended from all duties on behalf of the Company." In a letter explaining the reasons for plaintiff's termination shortly thereafter, defendant states: "During the entire term of your employment, you have communicated your deep dissatisfaction with your compensation to Ortho Biotech management and Ortho Biotech human resources personnel." On its face, defendant's suspension letter admits

that defendant considered the subject matter of plaintiff's deposition in its decision to terminate him, a deposition which included testimony about his Title VII race discrimination claim. The termination letter explicitly references plaintiff's communication of his dissatisfaction with his compensation.

*Id.* at 550. Ultimately, the Tenth Circuit concluded that "[t]aken in the light most favorable to plaintiff, ... the letters, coupled with the close temporal proximity between plaintiff's deposition and firing, directly support the jury's finding that defendant terminated plaintiff in retaliation for his pursuit of his Title VII race discrimination claim."

Similarly, plaintiffs' evidence here demonstrates that Mr. Vigdal considered the letter of Mr. Pepper's counsel in discharging the individual plaintiffs—a letter which laid out in great detail the nature of the potential claims Mr. Pepper and his family could assert against defendants, including those based on defendants' allegedly unlawful conduct under Title VII. In that regard, both Ms. O'Tool and Mr. Pepper aver that when Mr. Vigdal hand-delivered the termination letters on April 5, 2000 he made specific reference to the letter from Mr. Pepper's counsel. Ms. O'Tool, for example, avers that Mr. Vigdal handed her the termination letter and stated that she was being fired "in light of the situation with [Mr. Pepper] and the letter that had been received from [Mr. Pepper's] lawyer the Friday before." Similarly, Mr. Pepper testified that Mr. Vigdal, at the time he delivered the termination letter to Mr. Pepper, said, "In light of the fact that you lost $3 million and the fact that your attorney sent a letter and we can't talk to you anymore, we're terminating you." Moreover, plaintiffs were notified of the discharge decision just days after defendants received the letter from Mr. Pepper's

counsel. As the Tenth Circuit concluded in *Medlock*, then, so must the court here conclude that a reasonable jury could find that defendants terminated plaintiffs' employment in retaliation for their pursuit of their legal rights.

Defendants urge in their papers that Mr. Vigdal's alleged reference to the letter from Mr. Pepper's counsel is "irrelevant" because the termination decisions were made long before plaintiffs made any complaints about discrimination. Specifically, defendants maintain that they were contemplating the termination of the individual plaintiffs as early as February 2000. Defendants further argue that the letters written to plaintiffs terminating their employment were drafted the morning of March 31, 2000 and defendants did not receive the letter from Mr. Pepper's attorney until the afternoon of March 31, 2000. A fair reading of the record before the court, however, reveals that defendants had not contemplated terminating Mr. Pepper until after he started complaining about defendants' unlawful conduct and that, until that time, defendants only contemplated replacing Mr. Pepper as president of GMK and moving Mr. Pepper into an engineering position. In any event, defendants' evidence notwithstanding, a jury could conclude, in light of plaintiffs' evidence, that the letter from Mr. Pepper's counsel was the proverbial straw that broke the camel's back and that, but for the letter from Mr. Pepper's counsel, de-

fendants would not have carried out their tentative plans to terminate plaintiffs.

Summary judgment, then, is denied on plaintiffs' retaliation claims.[8]

● **Mr. O'Tool's Retaliation Claim**

While it is undisputed that both Mr. Pepper and Ms. O'Tool engaged in protected activity, it is also undisputed that Mr. O'Tool did not engage in any protected activity. His retaliation claim, then, is one that courts often refer to as "third-party" retaliation. That is, Mr. O'Tool claims that defendants retaliated against him based on the protected activity of his family members. Defendants contend that Mr. O'Tool's retaliation claim fails as a matter of law in that the plain language of Title VII prohibits only retaliation against the actual person who engaged in protected activity.

■ Title VII prohibits employers from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). As Mr. O'Tool concedes that he did not assist his father or his wife in any manner with their respective complaints of discrimination, the sole question for resolution with respect to Mr. O'Tool's claim is whether Title VII's anti-

---

**8.** Defendants also contend in their papers, albeit somewhat in passing, that summary judgment is warranted because Mr. Pepper did not believe in good faith that Mr. Vigdal was discriminating against Ms. O'Tool on the basis of her pregnancy when Mr. Pepper wrote his letter of March 13, 2000. *See Love v. RE/MAX of Am., Inc.,* 738 F.2d 383, 385 (10th Cir.1984) (opposition activity is protected so long as the plaintiff has a good faith belief that Title VII has been violated). This argument, however, ignores the fact that plaintiffs' retaliation claims are based not only on Mr. Pepper's March 13, 2000 letter but also on the March 31, 2000 letter from Mr. Pepper's counsel—a letter which challenged numerous acts and omissions of defendants, not only the denial of Ms. O'Tool's raise. In any event, factual disputes exist with respect to whether Mr. Pepper subjectively believed that Mr. Vigdal had discriminated against Ms. O'Tool on the basis of her pregnancy.

retaliation provision prohibits an employer from taking adverse action against a third party in retaliation for another's protected activity. Although the court "recognizes that allowing an employer to retaliate against a third party with impunity can interfere with the overall purpose" of Title VII's anti-retaliation provision, the court believes that the plain text of the provision clearly prohibits only retaliation against the individual who engaged in protected activity. *See Fogleman v. Mercy Hosp., Inc.,* 283 F.3d 561, 564 (3rd Cir.2002).

Although the Tenth Circuit has not had the opportunity to address the question before the court, several circuit and district courts have done so and those courts fall into two camps. Plaintiffs urge the court to adopt the approach embraced by those courts that have extended protection to persons merely associated with or related to a person who has engaged in protected activity. This approach is perhaps best reflected in *EEOC v. Nalbandian Sales, Inc.,* 36 F.Supp.2d 1206, 1209–12 (E.D.Cal. 1998), wherein the court concluded that the statutory language of Title VII's anti-retaliation provision is ambiguous and ultimately relied on policy considerations in expanding the scope of the anti-retaliation provision to protect third parties. Other district courts have reached the same conclusion for similar reasons. *See, e.g., Gonzalez v. New York State Dep't of Correctional Servs.,* 122 F.Supp.2d 335, 346–47 (N.D.N.Y.2000) (strictly construing the language of Title VII to preclude third-party retaliation claims would permit employers to circumvent Title VII's remedial scheme) (collecting cases); *DeMedina v. Reinhardt,* 444 F.Supp. 573, 580 (D.D.C. 1978). The only federal circuit courts to have addressed this specific issue, however, have concluded (albeit sometimes reluctantly) that the plain text of Title VII's anti-retaliation provision and analogous provisions in other federal anti-discrimina-

tion statutes do not make actionable retaliation against an employee who has not engaged in protected activity. *See Fogleman,* 283 F.3d at 568–70; *Smith v. Riceland Foods, Inc.,* 151 F.3d 813, 819 (8th Cir.1998); *Holt v. JTM Indus., Inc.,* 89 F.3d 1224, 1226–27 (5th Cir.1996).

The court has carefully read and considered each of these decisions as well as the parties' arguments. Ultimately, the court finds the reasoning of Judge Becker in the *Fogleman* decision most persuasive. In *Fogleman,* the Third Circuit determined that the plain text ADEA's anti-retaliation provision could not be expanded to protect third parties. 283 F.3d at 570. Significantly, the ADEA's anti-retaliation provision mirrors Title VII's anti-retaliation provision. While the ADEA forbids retaliation against an individual because "such individual" has engaged in protected conduct, *see* 29 U.S.C § 623(d), Title VII forbids retaliation against an individual because "he" has engaged in protected conduct. 42 U.S.C. § 2000e–3(a). Readily concluding that the language of the statute is unambiguous, Judge Becker stated, "[i]ndeed, it is hard to imagine a clearer way of specifying that the individual who was discriminated against must also be the individual who engaged in protected activity." *Id.* at 568.

Plaintiffs here correctly contend that a literal reading of Title VII's anti-retaliation provision conflicts with the policies embodied in that provision. Judge Becker also recognized the tension between the statute's plain meaning and its general policy objectives:

> The anti-retaliation provisions recognize that enforcement of anti-discrimination laws depends in large part on employees to initiate administrative and judicial proceedings. There can be no doubt that an employer who retaliates against

the friends and relatives of employees who initiate anti-discrimination proceedings will deter employees from exercising their protected rights.... Allowing employers to retaliate via friends and family, therefore, would appear to be in significant tension with the overall purpose of the anti-retaliation provisions, which are intended to promote the reporting, investigation, and correction of discriminatory conduct in the workplace.

*Id.* at 568–69. Nonetheless, Judge Becker reasoned that the conflict ought to be resolved in favor of the statute's plain meaning:

The preference for plain meaning is based on the constitutional separation of powers—Congress makes the law and the judiciary interprets it. In doing so we generally assume that the best evidence of Congress's intent is what it says in the texts of the statutes.

*Id.* at 569.

Judge Becker also rejected the notion that adhering to the literal terms of the statute in this situation would "lead to a patently absurd result that no rational legislature could have intended." *Id.* As Judge Becker reasoned:

[W]hile we do not find them particularly convincing, there are at least plausible policy reasons why Congress might have intended to exclude third-party retaliation claims.

For instance, Congress may have thought that "[i]n most cases, the relatives and friends who are at risk for retaliation will have participated in some manner in a co-worker's charge of discrimination," thereby having themselves

engaged in protected activity. If this is true, then the occurrence of pure third-party retaliation will be rare, so that not allowing claims to proceed in these few instances would not necessarily "defeat the plain purpose" of the anti-discrimination laws....

Moreover, Congress may have feared that expanding the class of potential anti-discrimination plaintiffs beyond those who have engaged in protected activity to include anyone whose friends or relatives have engaged in protected activity would open the door to frivolous lawsuits and interfere with an employer's prerogative to fire at-will employees.

*Id.* at 569–70.

Based on the rationale of the *Fogleman* decision, this court rejects as a matter of law Mr. O'Tool's third-party retaliation claim. Summary judgment in favor of defendants is granted on this claim.

● Breach of Employment Agreements

The individual plaintiffs contend that defendants breached both express and implied terms of plaintiffs' respective employment agreements. The court begins with plaintiffs' claims concerning defendants' alleged breach of certain express terms of the employment agreements. In that regard, Mr. and Ms. O'Tool contend that, pursuant to the express language of their employment agreements, defendants could not discharge Mr. or Ms. O'Tool prior to the end of the three-year employment period except in four narrow circumstances and that factual issues exist with respect to whether they were discharged for one of those four reasons.[9] The sec-

---

9. In arguing that defendants breached an express term of their respective employment agreements, the O'Tools begin their argument with the phrase "for example," and then proceed to discuss their argument concerning

Sections 3 and 7 and the termination of the O'Tools prior to the end of the three-year term. Mr. Pepper's argument concerning his breach of contract claim also begins with the phrase "for example." This phrase, of

tions of the employment agreement pertinent to this argument are sections 3 and 7 and those sections state, in relevant part, as follows: [10]

> Term of Employment. This Agreement shall have a term of three (3) years, subject to earlier termination pursuant to the provisions of Section 7 hereof.

> \* \* \* \*

> Termination and Severance.

> (a) This Agreement may be terminated prior to the end of the three (3) year term by Genmar Kansas for (i) cause, (ii) lack of adequate job performance as determined by Genmar Kansas' President and the President of Genmar Holdings, (iii) death of Employee, or (iv) disability of Employee.

> (b) In the event Genmar Kansas terminates Employee's employment for any reason other than termination for cause, death or disability Employee shall be entitled to six (6) months of severance pay at the base salary Employee is earning on the date of such termination.

According to plaintiffs, then, Section 7 clearly restricts defendants' ability to terminate the O'Tools prior to the end of the three-year term. As it is undisputed that neither Mr. nor Ms. O'Tool were terminated for cause, death or disability,[11] plaintiffs contend that factual disputes abound concerning whether Mr. and Ms. O'Tool were discharged for inadequate job performance (as opposed to some unlawful reason) and whether that alleged inadequate job performance was "determined by Genmar Kansas' President and the President of Genmar Holdings."

■■■ Under Kansas law,[12] the construction of a written contract is a matter of law for the court. *Wagnon v. Slawson Exploration Co.,* 255 Kan. 500, 511, 874 P.2d 659 (1994). The "cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow." *Ryco Packaging Corp. v. Chapelle Int'l, Ltd.,* 23 Kan. App.2d 30, 36, 926 P.2d 669 (1996) (citing *Hollenbeck v. Household Bank,* 250 Kan. 747, 751, 829 P.2d 903 (1992)). Where a contract is complete and unambiguous on its face, the court must determine the parties' intent from the four corners of the document, without regard to extrinsic or parol evidence. *Simon v. National Farm-*

---

10. For purposes of this claim, the relevant provisions of Mr. and Ms. O'Tool's respective agreements are identical.

11. The agreements signed by Mr. and Ms. O'Tool define "cause" as "a material violation of this Agreement, fraud, embezzlement, securities laws violation, sexual harassment of fellow employees or other gross misconduct involving moral turpitude."

12. Each of the employment agreements contains a provision stating that the agreement will be governed by Kansas law. None of the parties challenges the enforceability of that provision.

course, suggests that plaintiffs contend that defendants breached express terms of plaintiffs' employment agreements in addition to the terms specifically identified by plaintiffs in their papers. The court, then, is left to wonder whether plaintiffs, in fact, are suggesting that additional specific breaches occurred. Unfortunately, the pretrial order sheds no light on the nature of this claim. To the extent plaintiffs' use of the phrase is intended to enable plaintiffs to preserve all possible theories of breach for trial, the court will require plaintiffs to point to specific language in the pretrial order manifesting that additional theories were preserved. To the extent the phrase reflects no more than a stylistic convention, it would be more helpful for counsel to use more precise language in future submissions to the court.

*ers Org., Inc.*, 250 Kan. 676, 679–80, 829 P.2d 884 (1992).

As an element of contractual construction, whether an instrument is ambiguous is a question of law for the court. *Id.* A contract is ambiguous if it contains "provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Id.* Contractual ambiguity appears only when "the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more possible meanings is the proper meaning." *Marquis v. State Farm Fire and Cas. Co.*, 265 Kan. 317, 324, 961 P.2d 1213 (1998). The court must not consider the disputed provision in isolation, but must instead construe the term in light of the contract as a whole, such that if construction of the contract in its entirety removes any perceived ambiguity, no ambiguity exists. *Arnold v. S.J.L. of Kansas Corp.*, 249 Kan. 746, 749, 822 P.2d 64 (1991).

Construing Sections 3 and 7 as a whole, the court agrees with plaintiffs that these sections clearly and unambiguously provide that defendants can terminate the O'Tools prior to the end of the three-year term only for cause, inadequate job performance, death or disability. Curiously, however, Section 12 of the agreement, the last section of the agreement (entitled "Miscellaneous"), contains a sentence, albeit somewhat buried in the paragraph, that states "This Agreement shall not give Employee any right to be employed for any specific time or otherwise limit Genmar Kansas' right to terminate Employee's employment at any time with or without cause." This sentence, then, is completely inconsistent with Sections 3 and 7.

Contrary to defendants' argument, the language of Section 12 does not entitle defendants to summary judgment on the O'Tools' breach of contract claims. At best, Section 12 raises an ambiguity in the contract such that parol evidence "is admissible to determine the intent of the parties to the contract." *Hart v. Sprint Communications Co., L.P.*, 872 F.Supp. 848, 854 (D.Kan.1994) (citing *Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, 738 P.2d 866 (1987)). Moreover, as the ambiguity in the agreement presents a question of fact rather than a clear question of law, it is for the jury to resolve the issue. *See Snodgrass v. State Farm Mut. Auto. Ins. Co.*, 15 Kan.App.2d 153, 157, 804 P.2d 1012 (1991) (if ambiguity in written instrument presents question of fact then question is for jury). Summary judgment, then, is denied to the extent the O'Tools claim that defendants breached an express term of their respective employment agreements.

Mr. Pepper claims that defendants breached Section 1.02 of his employment agreement. Section 1.02 states as follows:

1.02 Duties. Executive shall perform such other duties as are customarily performed by one holding the position of President in other, same, or similar businesses or enterprises as engaged in by Genmar Kansas, and shall also additionally render similar services and duties as may be assigned to him from time to time by Genmar Kansas' Member(s) or their designee.

Mr. Pepper contends that defendants, in section 1.02, "contractually agreed to provide Mr. Pepper the necessary operational and other decision-making discretion and authority to perform 'duties as are customarily performed by one holding the position of President in other, same, or similar businesses or enterprises as engaged in by Genmar Kansas.'" Mr. Pepper further asserts that defendants breached this con-

tractual provision by stripping Mr. Pepper of basic operational authority.

The court easily concludes that Section 1.02 is devoid of any language suggesting defendants' promise to provide Mr. Pepper with operational and/or decision-making discretion and authority. Rather, Section 1.02 is simply Mr. Pepper's promise to perform his duties as president of GMK; it contains no affirmative promise on the part of defendants to give Mr. Pepper the resources to fulfill those duties. Moreover, Section 1.01 expressly provides that Mr. Pepper's employment as president of GMK "is subject to the general supervision and pursuant to the orders, advice, and direction of Genmar Kansas' Manager(s) or their designee." Read as a whole, then, Article 1 of Mr. Pepper's employment agreement in no way contains the promise alleged by Mr. Pepper. Summary judgment is granted in favor of defendants on Mr. Pepper's breach of contract claim to the extent the claim is based on an express breach of his employment agreement.[13]

Plaintiffs also suggest in their papers that defendants breached an implied covenant of good faith and fair dealing inherent in their individual employment contracts.[14] Defendants' motion for summary judgment, however, does not address this aspect of plaintiffs' breach of contract claim. For this reason, and because neither the pretrial order nor plaintiffs' papers shed any light on the nature of this theory, the court declines to analyze at this stage of the proceedings the merits of plaintiffs' claim concerning the implied covenant of good faith and fair dealing as it relates to their employment contracts. Once the parties have had a full opportunity to present their evidence and explain their arguments relating to this claim, the court will determine whether plaintiffs are entitled to proceed with the claim.

● Plaintiffs' Commercial Claims

In addition to the various employment-related claims asserted by plaintiffs, plaintiffs set forth in the pretrial order several commercial claims arising out of defendants' acquisition of Horizon Marine. Specifically, plaintiffs claim that defendants Genmar Holdings and Genmar Industries tortiously interfered with plaintiffs' employment agreements and with the purchase agreement and that defendants tortiously breached the duty of good faith and fair dealing. Plaintiffs Mr. Pepper and Horizon further contend that defendants tortiously interfered with plaintiffs' relationships with boat dealers and that defendants breached both the express terms of the purchase agreement and the implied covenant of good faith and fair dealing inherent in that purchase agreement. Fi-

---

**13.** Mr. Pepper also suggests in his papers that if defendants terminated his employment in violation of Title VII, then that conduct would breach express provisions in his employment agreement concerning termination. This argument is unavailing for at least two reasons. First, Mr. Pepper fails to point to any specific provision of the contract that was allegedly breached even assuming defendants terminated his employment in violation of Title VII. Second, Mr. Pepper's contract theory seems to be entirely duplicative of his Title VII retaliation claim. As Mr. Pepper would not be entitled to recover damages beyond those that would be available under his Title VII claim, the court dismisses as duplicative Mr. Pep-

per's breach of contract claim to the extent that claim is based on the theory that the breach stemmed from defendants' alleged termination of Mr. Pepper in retaliation for engaging in activity protected under Title VII.

**14.** While plaintiffs clearly assert that defendants breached the implied covenant of good faith and fair dealing in connection with the purchase agreement, it appears from plaintiffs' papers that they have asserted a separate claim for defendants' alleged breach of the covenant implied in their employment contracts.

nally, all plaintiffs claim that defendants' course of conduct amounts to fraud.

Defendants move for summary judgment on each of plaintiffs' commercial claims except, presumably by mere oversight, plaintiffs' claim that defendants tortiously interfered with the purchase agreement and their employment agreements.[15] Defendants also move for summary judgment on plaintiffs' claim for damages to the extent they seek the full amount of the earn-out consideration because, according to defendants, those damages are speculative. As set forth in more detail below, defendants' motion is granted in part and denied in part.

- **Tortious Breach of the Duty of Good Faith and Fair Dealing**

■ In the pretrial order, plaintiffs assert a claim based on defendants' alleged tortious breach of the duty of good faith and fair dealing. Defendants move for summary judgment on this claim on the grounds that Kansas law simply does not recognize a tort claim for breach of the duty of good faith and fair dealing in cases involving commercial contracts. *See, e.g., Kanco Distributing, Inc. v. Snapper, Inc.,* 1998 WL 47594, *9 (D.Kan. Jan. 26, 1998); *Wayman v. Amoco Oil Co.,* 923 F.Supp. 1322, 1359 (D.Kan.1996). In response, plaintiffs concede that Kansas courts have not yet recognized a cause of action for tortious breach of the duty of good faith and fair dealing in the commercial context but nonetheless urge the court to extend existing law in light of defendants' egregious conduct. The court declines to do so. A federal court is simply not the forum in which to proclaim new theories of liability that the state itself has not yet

recognized. Defendants' motion is granted as to this claim.

### Tortious Interference with Business Relations

Plaintiffs Mr. Pepper and Horizon Marine assert a claim for tortious interference with business relations based on Genmar's alleged disruption of Horizon Marine's boat dealer relationships. According to plaintiffs, the "intentional misconduct by Defendants was their fraudulent inducement of Plaintiffs to enter into the Purchase Agreement (which resulted in Plaintiffs' conveyance, procured by fraud, of Plaintiffs' legally protected interest in future business relations with its dealers)." The court agrees with defendants that summary judgment in favor of defendants is warranted on this claim.

■ As an initial matter, the court notes that plaintiffs have directed the court to no authority whatsoever supporting their theory of tortious interference and plaintiffs dedicate less than one page of their 130 page brief to this claim. This suggests to the court that plaintiffs have not given much thought to their claim for tortious interference. Moreover, in the pretrial order, plaintiffs assert that $5.2 million—the full amount of the earn-out consideration—is the appropriate measure of damages for "all of their commercial claims," including their claim for tortious interference. Under Kansas law, however, the measure of damages for a tortious interference claim is the loss of profits and loss of future profits that the plaintiff would have earned had the defendant not interfered with the relationship. *See, e.g., Hawkinson v. Bennett,* 265 Kan. 564, 590–93, 962 P.2d 445 (1998). This, then, is another indication that plaintiffs have not

---

**15.** As defendants' papers make no mention of plaintiffs' claim that defendants tortiously interfered with the purchase agreement and their employment agreements, the court need not concern itself with the merits of the claim at this stage in the proceedings.

carefully thought through their claim for tortious interference.

In any event, plaintiffs have set forth a claim for fraud based on the same alleged wrongful conduct that is at the heart of their tortious interference claim-defendants' fraudulent inducement of plaintiffs to sell Horizon Marine. Plaintiffs would not be entitled to recover for this wrongful conduct under both theories as it would be a windfall to plaintiffs to recover both the benefit-of-the-bargain damages on their fraud claim as well as their lost future profits on their tortious interference claim. Stated another way, plaintiffs would not be permitted to receive the benefit of the purchase agreement (the $5.2 million) while at the same time receive profits that allegedly would have been earned from dealer relationships had the purchase agreement not been executed. Moreover, as plaintiffs' tortious interference claim is based on defendants' alleged fraudulent conduct, plaintiffs would have to prove fraud in order to prevail on their tortious interference claim. If they are unsuccessful in proving fraudulent conduct, they can no more recover for tortious interference, under their theory, then they can for the tort of fraud. The tortious interference claim, then, does not provide plaintiffs with an alternative theory of recovery.

In short, as plaintiffs are not entitled to recover damages under both theories and because plaintiffs' tortious interference claim is redundant, summary judgment is granted in favor of defendants on plaintiffs' tortious interference claim.

Breach of Contract

In the pretrial order, plaintiffs Mr. Pepper and Horizon Marine assert that defendants breached the purchase agreement's express and implied terms,[16] including the implied covenant of good faith and fair dealing. In support of their motion for summary judgment, defendants assert only that the implied contractual obligations they purportedly breached are insufficient to state a claim for breach of the implied covenant of good faith and fair dealing because the implied obligations relied upon by plaintiffs directly contravene the parties' express agreement.

 Under Delaware law,[17] an implied covenant of good faith and fair dealing inheres in every contract. *Chamison v.*

---

**16.** Although plaintiffs, in the pretrial order, indicate that their breach of contract claim is based on an alleged breach of the express terms of the purchase agreement (in addition to implied terms), defendants' motion for summary judgment is silent on the issue of whether they breached any express terms of the contract and focuses solely on the implied covenant aspect of plaintiffs' claim.

In their response, plaintiffs point out that their claim is not based solely on the implied covenant of good faith and fair dealing, but is also based on defendants' alleged breaches of express provisions of the contract. According to plaintiffs, defendants' decision to shut down the GMK facility in May 2002 prior to the end of the five-year earn-out consideration period-constitutes a breach of the provision containing the five-year earn-out period. Plaintiffs also contend that defendants' elimi-

nation of the Nova brand and subsequent production of the Horizon/Nova boat designs with other Genmar labels constitutes a breach of the express terms of the contract.

Because these claims were not raised in defendants' motion, and because none of the parties' briefing addresses the relevant issues in any meaningful way, the court declines to resolve plaintiffs' breach of contract claim to the extent it is based on an alleged breach of express terms at this juncture. The court reserves any ruling on the merits of this claim until after the parties have had an opportunity at trial to present their evidence and arguments concerning the claim.

**17.** The purchase agreement contains a provision identifying Delaware law as the parties' choice of law. None of the parties challenges this provision.

*HealthTrust, Inc.,* 735 A.2d 912, 920 (Del. Ch.1999). As such, a party to a contract has made an implied covenant to interpret and to act reasonably upon contractual language that is on its face reasonable. *Id.* This implied covenant "is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement," one side uses "oppressive or underhanded tactics" to prevent the other party from receiving the fruits of the contract. *Id.* It requires the court to "extrapolate the spirit of the agreement from its express terms" and based on that "spirit," determine the terms that the parties would have bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose. *Id.* at 920–21. The court then implies the extrapolated term into the express agreement as an implied covenant and treats its breach as a breach of the contract. *Id.* at 921. The implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract. *Id.* The implied covenant will arise, however, "only where it is *clear* from what the parties expressly agreed, that they would have proscribed the challenged conduct as a breach of [their agreement] had they thought to negotiate with respect to the matter." *Corporate Property Assocs. 6 v. Hallwood Group Inc.,* 792 A.2d 993, 1002–03 (Del.Ch. 2002).

 Thus, the principle relied upon by defendants in support of their motion for summary judgment—that the implied covenant cannot be used to contravene the parties' express agreement—is certainly an accurate statement under Delaware law. *See Chamison,* 735 A.2d at 921. Nonetheless, the court rejects defendants' application of this general rule of law to the factual record of this case. Specifical-

ly, the court concludes that the purchase agreement does not clearly and unambiguously cover these specific issues. Defendants' motion, then, is denied on this claim.

According to defendants, plaintiffs' implied contract claim is based on defendants' changing the name of Horizon brand boats to Nova and marketing the boats to a different segment of the boat-buying population; defendants' insisting that GMK manufacture different models of three different brands of boats on short notice; defendants' instructing GMK to give priority to the manufacture of Ranger and Crestliner brands of boats over the Nova line; and defendants' making GMK the "dumping ground" for undesirable tasks, thereby decreasing the profitability of GMK. Defendants maintain that each of these issues is expressly covered in the purchase agreement such that the implied covenant simply does not come into play.

With respect to the changing of Horizon's name to Nova, defendants contend that the earn-out provision expressly indicates that the parties contemplated changing the Horizon brand name in that the provision bases plaintiff's earn-out consideration in part on the sale of Horizon "or any direct successor" brand boats. At best, this language is ambiguous such that the trier of fact would be entitled to consider parol evidence concerning what the parties intended the phrase "direct successor" to mean. *See Judge v. Rago,* 570 A.2d 253, 257 (Del.1990). Defendants next contend that plaintiffs' complaints about the change in the marketing direction of the Nova brand and the mandated production of additional non-Nova brand directly contradicts express provisions in the contract wherein Mr. Pepper agreed to be "subject to the general supervision of GMK's board of directors," agreed to act "pursuant to the orders, advice and direction" of the same, and agreed to use his

"best efforts" to advance "GMK's interests and Business." This language, however, does not expressly indicate that GMK will be required to manufacture different models of various boat brands or that the Horizon/Nova brand would be marketed to a different segment of the population. While the agreement does mention the manufacture of other Genmar brand boats at the GMK facility after the closing date, it apparently does so only in the context of describing the earn-out formula (*i.e.,* Mr. Pepper's earn-out consideration is based in part on the sale of Horizon (or any direct successor) brand boats and in part on the sale of other Genmar brand boats). It follows, then, that the contract is devoid of any express language addressing the order of priority for the manufacture of various boat brands. Defendants do not point to any specific express term in the purchase agreement that allegedly addresses the issue of whether GMK will be used as a "dumping ground" for undesirable tasks.

In short, the express language of the agreement does not indicate on its face that the conduct challenged by plaintiffs (conduct that includes not only those acts or omissions referenced by defendants above but also includes defendants' shutting down the GMK facility prior to the end of the five-year earn-out period and eliminating the Nova brand) was specifically contemplated by the parties during negotiations. In the absence of any other arguments from defendants, further proceedings are required to determine whether defendants' conduct was meant to prevent or hinder plaintiffs' realization of the earn-out consideration and whether the parties would have proscribed that conduct as a breach of their agreement had they thought to address those issues in the express agreement.

● Fraud

Plaintiffs assert a claim against defendants for fraudulent misrepresentation.

Defendants' motion for summary judgment on this claim is based on four separate and independent grounds. First, defendants contend that plaintiffs are barred from asserting a fraud claim because plaintiffs' fraud claim covers the same subject matter as is governed by the contractual relationship between the parties. Second, defendants contend that plaintiffs' claim is not actionable because the alleged misrepresentations relate to future events. Third, defendants maintain that the integration clause contained in the purchase agreement bars plaintiffs' claim because plaintiffs could not have reasonably relied on pre-contractual promises when the contract they signed expressly superseded such statements. Finally, defendants urge that plaintiffs' fraud claim fails on the merits in that plaintiffs have not come forward with clear and convincing evidence that any representations allegedly made by defendant were untrue or that defendants intended to deceive plaintiffs. In the alternative, defendants move for summary judgment on plaintiffs' claim for punitive damages with respect to their fraud claim. For the reasons set forth below, the court rejects each of defendants' arguments and, thus, denies defendants' motion with respect to plaintiffs' fraud claim.

 Defendants first argument with respect to plaintiffs' fraud claim is based on the well-recognized principle that the existence of a contractual relationship bars the assertion of tort claims covering the same subject matter governed by the contract. *See Atchison Casting Corp. v. Dofasco, Inc.,* 889 F.Supp. 1445, 1461 (D.Kan.1995) (and cases cited therein). Stated another way, tort duties may not be imposed on a party where the party's duties and rights are specifically defined by contract. *See id.* However, plaintiffs'

fraud claim here stems from purported assurances that allegedly induced plaintiffs to enter into the purchase and employment agreements. As this court has previously recognized, fraudulent inducement to enter a contract constitutes a tort independent of a claim for breach of the same contract. *Id.* at 1462 (citing *Smith v. MCI Telecommunications Corp.*, 755 F.Supp. 354, 356–57 (D.Kan.1990)). Moreover, the court simply rejects defendants' contention that the purported assurances are explicitly addressed in the purchase and employment agreements.

 Defendants next assert that plaintiffs' fraud claim is "fatally flawed" because the statements on which plaintiffs rely relate to future events and, as such, the statements are not actionable under Kansas law. *See Flight Concepts Ltd. v. Boeing Co.*, 38 F.3d 1152, 1157 (10th Cir. 1994) ("To be actionable, a misrepresentation must relate to a pre-existing or present fact; statements or promises about future occurrences are not actionable.") (applying Kansas law). Of course, an exception to this rule exists "where evidence establishes that, at the time the promise as to future events was made, the promisor did not intend to perform the promised action." *Id.* It is this exception upon which plaintiffs rely and genuine issues of material fact exist with respect to whether defendants, prior to or at the time of contracting, did not intend to fulfill their purported promises concerning, *inter alia,* Mr. Pepper's freedom to operate GMK as he saw fit, defendants' commitment to the manufacture and sale of the Horizon/Nova brand of boat, and Mr. Pepper's ability to realize the $5.2 million earn-out.

 According to defendants, plaintiffs cannot proceed with their fraud claim based on alleged verbal assurance made during contract negotiations because the purchase and employment agreements contain integration clauses effectively nullifying any extra-contractual oral or written representations. When an agreement is integrated, "evidence of prior or contemporaneous agreements or negotiations is not admissible to *contradict* a term of the writing." *See* E. Allan Farnsworth, *Contracts* § 7.3 (2d ed.1990) (emphasis added); *accord Flight Concepts*, 38 F.3d at 1157 ("Where the written contract directly contradicts the oral promises made during contract negotiations, the oral promise cannot be construed as fraudulent."). Here, the alleged representations do not directly contradict the express terms of the agreements. *Cf. Flight Concepts*, 38 F.3d at 1157 (no claim for fraudulent misrepresentation based on oral promise to produce aircraft where contract expressly released defendant from any obligation to produce aircraft). Summary judgment is not warranted on this basis.

 Defendants also contend that summary judgment is appropriate because plaintiffs' fraud claim fails on the merits. As defendants correctly state, actionable fraud under Kansas law "includes an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his injury." *Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, 603, 876 P.2d 609 (1994). According to defendants, plaintiffs have not presented clear and convincing evidence that any alleged statements made by defendants were untrue or that defendants made any statements with the intent to deceive plaintiffs. *See Waxse v. Reserve Life Ins. Co.*, 248 Kan. 582, 586, 809 P.2d 533 (1991) ("Fraud is never presumed and must be shown by clear and convincing evidence.").

■ Evidence is clear if it is certain, unambiguous, and plain to the understanding, and is convincing if it is reasonable and persuasive enough to cause the trier of fact to believe it. *See Ortega v. IBP, Inc.,* 255 Kan. 513, 528, 874 P.2d 1188 (1994) (citing *Chandler v. Central Oil Corp.,* 253 Kan. 50, 58, 853 P.2d 649 (1993)). The affidavits and deposition testimony of the individual plaintiffs satisfy this standard. While defendants argue that none of the alleged assurances were untrue because, for example, defendants did support the manufacture and sale of the Horizon/Nova brand of boat, plaintiffs' evidence is sufficient for a jury to infer that defendants did not support—to the extent allegedly promised—the production of Horizon boats. Similarly, plaintiffs' evidence is sufficient to support their theory that defendants induced plaintiffs into selling Horizon Marine for the primary (or sole) purpose of infiltrating the southern market and promoting their Ranger and Crestliner brands. Thus, despite defendants' insistence that plaintiffs' theory is "irrational" and that defendants "negotiated in good faith," a jury could find otherwise. Assessing the credibility of plaintiffs' evidence is a function for the jury and not for the court on summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").[18]

■ Defendants' alternative argument is that plaintiffs have not satisfied the "clear and convincing" standard with respect to their claim for punitive damages. See K.S.A. § 60–3701(c) ("In any civil action where claims for exemplary or punitive damages are included, the plaintiff shall have the burden of proving, by clear and convincing evidence in the initial phase of the trial, that the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud or malice."). Specifically, defendants contend that plaintiffs' evidence shows only that "operations failed to unfold in the manner both parties had hoped, not that defendants deliberately schemed to mislead plaintiffs." While a jury might ultimately agree with defendants' characterization of the evidence, plaintiffs' evidence is sufficiently clear and convincing to permit a jury to find that defendants fraudulently induced plaintiffs into entering the purchase and employment agreements—a conclusion that would support a finding of punitive damages.

● Plaintiffs' Damages

■ Finally, defendants assert that they are entitled to summary judgment on plaintiffs' claim for damages because those damages (or, more specifically, the $5.2 million in earn-out consideration) are "inherently speculative." Specifically, defendants contend that Mr. Pepper's ability to realize the earn-out consideration was entirely contingent on GMK's profitability; that because GMK was never profitable the jury would have to engage in guesswork to determine whether and to what extent GMK would have been profitable if Mr. Pepper had been permitted to operate and manage GMK as he saw fit; and that

---

18. Defendants also suggest in their papers that plaintiffs' evidence concerning the assurances is deficient because plaintiffs cannot "specify the exact promises made by defendants, much less the time and place of, or witnesses to, the promises" and because no reasonable person would rely on such "vague, undefined" promises. This argument lacks merit. The assurances described by plaintiffs in their affidavits and deposition testimony are more than adequate to state a claim for fraud.

plaintiffs' attempt to recover these damages (which defendants characterize as lost future profits) is unavailing as GMK has no prior history of profitable operations and no evidence that the business would be profitable.

The problem with defendants' argument, however, is that, at least according to plaintiffs' evidence, defendants' management employees assured Mr. Pepper that the $5.2 million earn-out was obtainable. In that regard, Mr. Pepper averred that "Mr. Oppegaard and other Genmar executives repeatedly assured [him] that the earn-out would, in fact, be obtainable and that [he] would have a fair and genuine opportunity to realize the earn-out consideration proposed by Genmar." Mr. Pepper also averred that·"Genmar executives went so far as to present [him] with their own estimates and projections of how much money the new company would make" and that Mr. Oppegaard and Mr. Cloutier "specifically stated during the negotiations that Genmar expected to make a lot of money on the deal, and that [he] should also expect to make a lot of money personally through full payment of the earn-out."

According to plaintiffs' evidence, then, defendants represented to plaintiffs that GMK's potential profits could be estimated with reasonable certainty and that sizeable profits were indeed contemplated by defendants. *See Vickers v. Wichita State University,* 213 Kan. 614, 618, 518 P.2d 512 (1974) (In Kansas, a plaintiff may recover lost profits resulting from breach of contract "when such profits are proved with reasonable certainty, and when they may reasonably be considered to have been within the contemplation of the parties.").[19] Thus, even assuming plaintiffs' claim for damages is one for lost future profits, defendants can hardly contend that such damages are speculative when their own agents represented otherwise. Defendants' motion for summary judgment is denied.

IT IS THEREFORE ORDERED BY THE COURT THAT defendants' motion for summary judgment on plaintiffs' commercial claims (doc. # 110) is granted in part and denied in part and defendants' motion for summary judgment on plaintiffs' employment claims (doc. # 111) is granted in part and denied in part.

IT IS SO ORDERED.

---

**19.** None of the parties dispute that Delaware law embodies the same "reasonable certainty" principle.